UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|                        |   |                      |
|------------------------|---|----------------------|
| CINDY L. KIROUAC,      | ) |                      |
|                        | ) |                      |
| Plaintiff,             | ) |                      |
|                        | ) |                      |
| v.                     | ) | 2:11-cv-00423-JAW    |
|                        | ) |                      |
| PATRICK R. DONAHOE,    | ) |                      |
|                        | ) |                      |
| Defendant.             |   |                      |

**ORDER ON THE DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Postmaster General of the United States Postal Service, Patrick R. Donahoe, moves to dismiss Count V of Cindy Kirouac's five-count employment discrimination lawsuit. In Count V, Ms. Kirouac alleges that the Post Office in Lewiston, Maine discriminated against her in violation of the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, when it fired her because of her mental disabilities. As she has raised several genuine issues of material fact, the Court denies the Postmaster General's motion.

## I.   STATEMENT OF FACTS

### A.   Procedural History

On November 7, 2011, Cindy L. Kirouac filed a five-count Complaint against Patrick R. Donahoe in his official capacity as the Postmaster General (Postmaster) of the United States Postal Services (Postal Service). *Compl. and Demand for Trial by Jury* (ECF No. 1) (*Compl.*). On October 19, 2012, the Postmaster filed a motion for partial summary judgment on Count V of Ms. Kirouac's Complaint, which

alleges that the Postal Service violated the Rehabilitation Act when it fired her as a mail carrier because of her disability. *Mot. for Partial Summ. J.* (ECF No. 85) (*Def.'s Mot.*). Ms. Kirouac responded to the Postmaster's motion on November 13, 2012. *Pl.'s Opp'n to Def.'s Mot. for Partial Summ. J.* (ECF No. 113) (*Pl.'s Opp'n*). The Postmaster replied to Ms. Kirouac's opposition on November 30, 2012. *Reply to Pl.'s Opp'n to the Mot. for Partial Summ. J.* (ECF No. 120) (*Def.'s Reply*).

On October 19, 2012, the Postmaster filed a statement of material facts in support of his motion. *Def.'s Statement of Undisputed Material Facts* (ECF No. 91) (DSMF). Ms. Kirouac filed her response to the Postmaster's statement of material facts and her statement of additional material facts on November 13, 2012. *Pl.'s Resp. to Def.'s Statement of Material Facts and Pl.'s Statement of Additional Material Facts* (ECF No. 104) (PRDSMF & PSAMF). The Postmaster filed a statement of additional facts in support of his motion on November 29, 2012. *Def.'s Additional Facts in Supp. of Mot. for Partial Summ. J.* (ECF No. 117) (DSAMF). On November 30, 2012, the Postmaster replied to Ms. Kirouac's statement of additional material facts. *Def.'s Reply to Pl.'s Statement of Additional Facts* (ECF No. 121) (DRPSAMF).

**B.    Factual Background[1]**

  **1.    Ms. Kirouac's Return to the Lewiston Post Office in March 2008 After Taking Medical Leave**

---

[1]  In accordance with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Ms. Kirouac's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In compliance with this obligation, the Court recites supported facts as true even if the Postmaster disputes them.

From February 2008 to July 2009, Mitchell Curtis was the Officer-in-Charge (OIC) of the Lewiston Post Office (Post Office), which meant that he was responsible for the operations and employees of that office; however, he consulted with David St. Andre (Postmaster St. Andre), the Labor Relations Specialist for the District of Maine and the official Postmaster of Lewiston, on personnel matters in the Post Office, including about Ms. Kirouac.[2]  DSMF ¶ 1; PRDSMF ¶ 1.  When OIC Curtis became Lewiston's OIC, Ms. Kirouac was employed as a mail carrier at the Post Office, but she was on extended leave.  DSMF ¶ 2; PRDSMF ¶ 2.

In late February of 2008, OIC Curtis was informed by a Postal Service Nurse, either Kathy Dyer or Debbi Murphy, that Ms. Kirouac's treating physician had authorized her to return to work, that medications had been effective in helping her focus, and that there would be times when she would need a little longer than eight hours per day to complete her mail carrier responsibilities.  DSMF ¶ 3; PRDSMF ¶ 3.  OIC Curtis was also informed by Nurse Dyer's office that Ms. Kirouac suffered

---

[2]     Ms. Kirouac interposed a qualified response to paragraph 3 to correct the date that OIC Curtis testified his tenure as OIC of the Post Office ended.  PRDSMF ¶ 1.  OIC Curtis' deposition confirms that he ended his position as the OIC of Lewiston in "July of 2009", *Dep. Tr. of Mitchell C. Curtis Part I* at 10:18-21 (ECF No. 109) (*Curtis Dep. I*); however, his declaration states that he was the OIC at the Post Office from "February, 2008 to July 2010", *Decl. of Mitchell Curtis* ¶ 3 (ECF No. 93) (*Curtis Decl.*).  The distinction between July 2009 and July 2010 does not appear to make a difference; all the critical events in this case took place before July 2009 and if OIC Curtis had an additional year of tenure, it would not appear to favor either party.  Nevertheless, on the chance that it matters and since the Court is required to view the facts in the light most favorable to the non-movant, the Court inserted the earlier date of OIC Curtis' departure from the Postal Service.

     Ms. Kirouac also qualified the description of OIC Curtis' duties by clarifying that Postmaster St. Andre continued to be the official Postmaster of the Lewiston Post Office and he was also the Labor Relations Specialist for the District of Maine, was responsible for personnel matters for the District, including the Lewiston Post Office, and was consulted about Ms. Kirouac.  PRDSMF ¶ 2.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court includes these qualifying facts.

from a panic disorder, Post Traumatic Stress Disorder (PTSD), major depression, an anxiety disorder, and Adult Attention Deficit Disorder (ADD).[3]  PRDSMF ¶ 3.

In the first and final version of a medical release letter dated February 26, 2008, Ronald Campbell, M.D., Ms. Kirouac's medical care provider, stated:

> Cindy Kirouac is in treatment with this office for Adult Attention Deficit Disorder, Major Depression, Anxiety and Panic Disorder as well as PTSD.
>
> I feel that Cindy is emotionally able to return to work.
>
> Because of Cindy's Adult A.D.D. she will, at times, take longer to organize her route or to distribute her mail on the street.  This should be negligible but she may take a little longer than the prescribed time and go over 8 hours per day or over 40 hours per week to complete her route.  The medication that Ms. Kirouac takes for this condition has been very effective in helping her focus and be less distractible.[4]

DSMF ¶ 4; PRDSMF ¶ 4.  Nurse Dyer also received additional medical documentation concerning Ms. Kirouac's medical conditions.[5]  PRDSMF ¶ 4.  Dr. Campbell's letter became part of Ms. Kirouac's medical file upon its receipt by the

---

[3]     Ms. Kirouac interposed a qualified response to paragraph 3 stating that OIC Curtis was also informed of her medical conditions.  PRDSMF ¶ 3.  The Court reviewed the record citation and, viewing the facts in the light most favorable to Ms. Kirouac, includes her qualification.  *See Curtis Dep. I* at 43:16-46:13 (acknowledging receipt of a letter from Dr. Campbell regarding Ms. Kirouac's medical conditions); *Ltr. from Dr. Campbell (Feb. 26, 2008)* (ECF Nos. 88 & 111-5) (*Dr. Campbell Feb. 2008 Ltr. I*) (stating he was treating Ms. Kirouac for Adult Attention Deficit Disorder, Major Depression, Anxiety, and Panic Disorder as well as PTSD); *EEO Investigative Aff.* at 1 (ECF No. 107-2) (listing the conditions OIC Curtis was aware of as "ADD, panic disorder and depression").

[4]     Viewing the facts in the light most favorable to Ms. Kirouac, the Court notes that this letter represents the initial letter drafted by Dr. Campbell before Ms. Kirouac asked him to add additional language.  *See* PSAMF ¶¶ 36, 38-39; DRPSAMF ¶¶ 36, 38-39.  This letter was filed with the Post Office after the first letter was not accepted by the Post Office's in-house counsel, Anna Crawford.  *See* PSAMF ¶¶ 36, 38-39; DRPSAMF ¶¶ 36, 38-39.  Accordingly, the Court includes language in this statement of fact to clarify that this is "the first and final version of a medical release letter" Dr. Campbell sent to the Post Office on Ms. Kirouac's behalf.

[5]     Ms. Kirouac interposed a qualified response clarifying that Nurse Dyer received medical documentation in addition to Dr. Campbell's February 2008 letter.  PRDSMF ¶ 4.  As her qualification is confirmed by the record, the Court incorporates Ms. Kirouac's qualified response.  *See Nurse Dyer's Summ. for Ms. Kirouac* (ECF No. 112) (*Nurse Dyer's Summ.*).

4

Postal Service sometime in late February.[6]  DSMF ¶ 5; PRDSMF ¶ 5.  Ms. Kirouac's medical file also contained other medical records concerning her conditions. PRDSMF ¶ 5.

Wendy Blouin (Supervisor Blouin), the Post Office's Supervisor of Customer Service, was Ms. Kirouac's immediate supervisor during most of the period from March 2008 through June 13, 2008.  PSAMF ¶ 41; DRPSAMF ¶ 41.  During a brief period in March 2008—between March 5, 2008 and March 18, 2008—Ms. Kirouac was supervised by Michael Anderson.  PSAMF ¶ 41; DRPSAMF ¶ 41.  On March 17, 2008, Ms. Kirouac's counsel sent a letter to the Post Office's counsel concerning Supervisor Anderson's supervision of Ms. Kirouac and she was not supervised by him again until May 30, 2008.  PSAMF ¶ 41; DRPSAMF ¶ 41.

Supervisor Blouin testified that pursuant to Dr. Campbell's February 26, 2008 medical release, as of February 2008 she was aware that Ms. Kirouac suffered from major depression, a panic disorder and ADD.[7]  PSAMF ¶ 42; DRPSAMF ¶ 42. Supervisor Blouin testified that she understands what a panic attack feels like because in 2009 she personally experienced one and felt like she "couldn't breathe, I

---

[6]     Ms. Kirouac interposed a qualified response disputing the date the Post Office received Dr. Campbell's letter.  PRDSMF ¶ 5.  She asserts they received it on February 29, 2008 and the Postmaster states they received it on or about February 26, 2008.  DSMF ¶ 5; PRDSMF ¶ 5.  The Court is unable to confirm, based on the record citation, exactly when the Post Office's in-house counsel received Dr. Campbell's letter.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court rephrases the date in paragraph 5 to "sometime in late February."  Ms. Kirouac also interposed a qualified response to paragraph 5 noting that the Post Office received additional medical documentation on her medical conditions.  PRDSMF ¶ 5.  The Court includes her qualification.  *See Nurse Dyer's Summ.*

[7]     The Postmaster interposed a qualified response to paragraph 42 and asserted that Supervisor Blouin was only aware of Ms. Kirouac's medical conditions because of Dr. Campbell's letter.  DRPSAMF ¶ 42.  Because the Postmaster's qualification is supported by the record, the Court qualifies paragraph 42.  *See Dep. Tr. of Wendy Blouin Part II* at 279:15-23 (ECF No. 106) (*Blouin Dep. II*).

get shaky" and cried; however, she noted that "[t]here may be different types" of panic attacks.[8]  PSAMF ¶ 54; DRPSAMF ¶ 54.  Supervisor Blouin also stated that Postmaster St. Andre informed her that Ms. Kirouac was a "Medical 8", meaning that Ms. Kirouac was limited to working eight hours per day due to medical restrictions.[9]  PSAMF ¶ 43; DRPSAMF ¶ 43.  Postmaster St. Andre told Supervisor Blouin about Ms. Kirouac's medical status before OIC Curtis became the OIC at the Post Office and before Ms. Kirouac was released to work at the Post Office without restrictions.  PSAMF ¶ 43; DRPSAMF ¶ 43.  OIC Curtis testified that as of February 2008 he was aware that Ms. Kirouac suffered from major depression, a panic disorder, and ADD.[10]  PSAMF ¶ 44; DRPSAMF ¶ 44.

---

[8]      The Postmaster denied paragraph 54 because it does not specify a relevant period of time and because there is no evidence that Supervisor Blouin has medical expertise on panic attacks. DRPSAMF ¶ 54.  The Court addresses both concerns in the Postmaster's denial by incorporating a relevant time period, noting that Supervisor Blouin's testimony concerned her own experience with panic attacks, and indicating that she acknowledged there may be different types of panic attacks. *See Dep. Tr. of Wendy Blouin Part I* at 112:5-113:6. (ECF No. 104-34) (*Blouin Dep. I*). Viewing the facts in the light most favorable to Ms. Kirouac, the Court includes paragraph 54.

[9]      The Postmaster denied paragraph 43 because it is vague on timing, irrelevant to the incident on June 13, 2008, and because Ms. Kirouac did not have any work restrictions.  DRPSAMF ¶ 43. The Court concludes that the statements in paragraph 43 are relevant because they satisfy the requirements of Rule 401 and are relevant to Ms. Kirouac's pretext argument.  *See* FED. R. EVID. 401 (stating that "[e]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without evidence; and (b) the fact is of consequence in determining the action"); *Compl.* ¶¶ 401-11. Yet, the Court includes an additional sentence to clarify that Supervisor Blouin was aware that Ms. Kirouac was a "Medical 8" prior to Dr. Campbell's February 26, 2008 letter and OIC Curtis' appointment as the OIC of the Post Office.  DRPSAMF ¶ 43.

[10]     The Postmaster denied the statements in paragraph 44 because the cited testimony describes a different set of circumstances and because OIC Curtis only had a layman's understanding of Ms. Kirouac's medical conditions.  DRPSAMF ¶ 44. First, the Court excludes Ms. Kirouac's statement in paragraph 44—"Mr. Curtis also stated that he decided to 'try a different form of managing Cindy,' and to not go after her for every little infraction due to 'seeing the size of her disciplinary file'"—because it is not supported by the record citation.  *See* PSAMF ¶ 44; DRPSAMF ¶ 44. To support her statement, Ms. Kirouac cited pages 43 to 45 of OIC Curtis' deposition; however, this testimony does not appear within the cited pages. The Court also includes a fact asserted in the Postmaster's denial, namely that OIC Curtis was aware that Ms. Kirouac could occasionally work over eight hours, because it is supported by the record.

## 2.     Ms. Kirouac's Medical Conditions and Periodic Restrictions from Work from 2005 to 2008

Ms. Kirouac has been diagnosed with major depression, a panic disorder, an anxiety disorder, and PTSD.  PSAMF ¶ 1; DRPSAMF ¶ 1.  These medical conditions are long term and date back to at least 2000.  PSAMF ¶ 2; DRPSAMF ¶ 2.  Ms. Kirouac has also been diagnosed with ADD, which is a life-long, permanent condition that can be managed with medication.[11]  PSAMF ¶ 3; DRPSAMF ¶ 3.  Ms. Kirouac was treated by Dr. Campbell, a psychiatrist, from December 2003 through May 2012 for her psychiatric conditions and ADD.  PSAMF ¶ 4; DRPSAMF ¶ 4.  She was also treated by Pamela Ross, M.D. for her psychiatric conditions from 2000 through 2005 and by Gabrielle Broche, LCSW for the same conditions from 2003 through 2010.  PSAMF ¶¶ 5-6; DRPSAMF ¶¶ 5-6.  Ms. Kirouac has been prescribed medications for her psychiatric conditions and ADD, including Effexor, Strattera, Wellbutrin and Xanax, since 2003 and 2005 to the present.  PSAMF ¶ 7; DRPSAMF ¶ 7.

When Ms. Kirouac has a panic attack, she experiences feelings of being smothered, difficulty breathing, tightness in her mouth and neck, intense fear, a pounding heart, trembling, shaking, dizziness, numbness, and nausea.[12]  PSAMF ¶

---

[11]     The Postmaster interposed a qualified response stating that the record establishes that Ms. Kirouac's ADD could be treated with medication and that medication was helping Ms. Kirouac "focus and be less distractible."   DRPSAMF ¶ 3; *see Dr. Campbell Feb. 2008 Ltr. I.*   Because the Postmaster's qualification is supported by the record, the Court includes it.

[12]     The Postmaster interposed a qualified response to the statements in paragraph 14 because (1) the absence of a specific timeframe makes them vague or irrelevant, (2) there is no evidence to suggest the Postal Service was aware of these matters, (3) Dr. Campbell's February 26, 2008 letter released Ms. Kirouac to work without restrictions, and (4) Ms. Kirouac demonstrated an ability to perform her job successfully.  DRPSAMF ¶ 14.  First, the Court concludes that the symptoms Ms. Kirouac describes in paragraph 14 are relevant to her discrimination claim as it supports her

14; DRPSAMF ¶ 14.  She is essentially unable to think or make decisions during a panic attack and often simply wants to flee.  PSAMF ¶ 14; DRPSAMF ¶ 14.  In addition to her sleep deprivation, her panic disorder, PTSD, and anxiety disorder symptoms include hypervigilence, acute anxiety, hopelessness, and difficulty concentrating.[13]  PSAMF ¶ 15; DRPSAMF ¶ 15.  These symptoms impair Ms. Kirouac's ability to interact with others and concentrate.  PSAMF ¶ 15; DRPSAMF ¶ 15.  Yet, as of February 26, 2008, Dr. Campbell confirmed that Ms. Kirouac was emotionally able to return to work.  PSAMF ¶ 15; DRPSAMF ¶ 15.  Also, Ms. Kirouac's ADD is characterized by distractibility, disorganization, and impaired concentration, but on February 26, 2008, Dr. Campbell released her to work at the Post Office without restrictions and confirmed that the medication she takes for her ADD had been very effective in helping her focus and be less distractible.[14]  PSAMF ¶ 17; DRPSAMF ¶ 17.

Ms. Kirouac's psychiatric conditions have significantly limited, as compared to the average person in the general population, several major life activities including her ability to concentrate, think, sleep, remember, engage in self-care and

---

disability argument.  *See* FED. R. EVID. 401; PSAMF ¶ 1; DRPSAMF ¶¶ 1, 14.  The Court also accepts the Postmaster's third and fourth reasons for qualifying Ms. Kirouac's statement and incorporates them into paragraph 15.  *See Dr. Campbell Feb. 2008 Ltr. I.*

[13]     The Postmaster interposed a qualified response to paragraph 15 for the same reasons he qualified paragraph 14.  *See* DRPSAMF ¶¶ 14-15.  The Court accepts and rejects some of the Postmaster's reasons for qualifying paragraph 14 and qualifies the second statement in paragraph 15 to state "Yet, as of February 26, 2008, Dr. Campbell confirmed that Ms. Kirouac was emotionally able to return to work."  DRPSAMF ¶ 15.

[14]     The Postmaster interposed a qualified response to paragraph 17 for the same reasons he qualified paragraphs 14 and 16.  DRPSAMF ¶¶ 14, 16-17.  The Court declines to accept the Postmaster's timing and relevance objections but incorporates information from Dr. Campbell's February 26, 2008 letter as it is supported by the record.  *See Dr. Campbell Feb. 2008 Ltr. I.*

interact with others.[15]  PSAMF ¶ 8; DRPSAMF ¶ 8.  In Ms. Kirouac's opinion, the

impact of her psychiatric conditions on her life activities and functioning worsened

over the 2005 to 2008 period.[16]  PSAMF ¶ 16; DRPSAMF ¶ 16.  From 2005 to 2008,

Ms. Kirouac was severely impacted by her psychiatric conditions and at times was

restricted from working by her medical providers.[17]  PSAMF ¶ 9; DRPSAMF ¶ 9.

---

[15]     The Postmaster denied paragraph 8 for three reasons: (1) Dr. Voss' report is unsworn hearsay; (2) his opinion was subject to a *Daubert* challenge; and (3) "during the pertinent time period" Dr. Campbell's February 26, 2008 letter confirmed that Ms. Kirouac was able to work successfully despite her medical conditions. DRPSAMF ¶ 8. First, the Postmaster's objection to the contents of Dr. Voss' report because it is unsworn is precisely the type of objection the Court urged the parties not to make at the Local Rule 56(h) conference.  There is no reason to believe that Dr. Voss would not testify in accordance with his report.  In fact, the Postmaster's *Daubert* motion assumed as much.  *Def.'s* Daubert *Mot.* (ECF No. 55).  There is also no reason to require Ms. Kirouac to go to the trouble and expense of obtaining a sworn affidavit from a medical expert to confirm that the doctor would repeat under oath what he wrote in his report.   The Court overrules the Postmaster's hearsay and foundational objections and accepts the report as a valid basis for the statement of material fact.  However, if the Postmaster contends that the consideration of paragraph 8 is in error, it is free to file a motion to reconsider.  If it does so, the Court is likely to give Ms. Kirouac the opportunity to obtain a sworn declaration from the doctor.  Second, the Court granted the Postmaster's *Daubert* motion regarding Dr. Voss' expert testimony only insofar as Dr. Voss' testimony regarding legal issues.  *Order on Def.'s* Daubert *Mot. to Exclude Test. of Dr. Carlyle Voss* at 5-7 (ECF No. 131) (*Dr. Voss Order*).  Otherwise, the Court allowed Dr. Voss' expert testimony at trial.  *Id.* at 9.  Finally, the Court does not exclude paragraph 8 based upon Dr. Campbell's observation that Ms. Kirouac could work as of February 26, 2008 without restrictions because his letter does not contradict the contents of paragraph 8.  *Compare Dr. Voss Report*, *with Dr. Campbell Feb. 2008 Ltr. I.*

[16]     The Postmaster interposed a qualified response citing the reasons for his qualifications to paragraph 14 and objecting to the use of "worsened" without further detail as well as Ms. Kirouac's mention of "continuing harassment."  DRPSAMF ¶ 16.  First, the temporal concerns in paragraph 14 are futile; the statement refers to a specific time period, 2005 to 2008.  PSAMF ¶ 16.  Second, the Court has inserted "In Ms. Kirouac's opinion" to clarify that "worsened" reflects her personal opinion. Finally, the Court omits the last part of paragraph 16, which states "due to the continuing harassment she was subjected to", because it is argumentative and not supported by Ms. Kirouac's record citation.  *See Learnard v. Inhabitants of Van Buren*, 182 F. Supp. 2d 115, 119 n.3, 119-20 (D. Me. 2000) (stating "[s]ome of the statements are not facts at all" for example, one "fact" begins, "Richard Daigle has always been out to get Learnard"); *see also Daigle v. Stulc*, 794 F. Supp. 2d 194, 225 n.88 (D. Me. 2011).

[17]     The Postmaster denied the statements in paragraph 9 because the timeline—from 2005 to 2008—is too broad, is not supported by citations to the record confirming medically-based work restrictions, is irrelevant to the time period of this motion, and is not supported by evidence that the Post Office was aware of these issues.  DRPSAMF ¶ 9.  Ms. Kirouac cites her sworn declaration, an admissible piece of evidence, to support the time frame in paragraph 9.  *See Decl. of Cindy Kirouac* ¶¶ 10-11 (ECF No. 104-1) (*Kirouac Decl.*).  Although her statement is generally supported by the record, the Court agrees with the Postmaster that the time frame should reflect that Ms. Kirouac was only restricted from work "at times" during 2005 to 2008.  *See id.*  The Postmaster's remaining

Between July 7, 2005 and March 5, 2008, due to her medical conditions, Ms. Kirouac was restricted from working for approximately 40% of the time, which is fifty-five weeks of work or 2,220 work hours.[18]   PSAMF ¶ 18; DRPSAMF ¶ 18. "Stated another way, out of 2.66 years (7/17/2005 to 3/6/2008) Ms. Kirouac missed 1.06 years of work, approximately 40% of her scheduled work time, including from 4/18/2006 to 6/9/2006, 7/8/2005 to 7/25/2005, 8/26/2005 to 9/21/2005, 10/25/2005 to 12/7/2005, 12/10/2005 to 2/9/2006, 4/18/2006 to 6/9/2006, 2/28/2007 to 3/30/2007 and 9/21/2007 to 3/5/2008." PSAMF ¶ 18; DRPSAMF ¶ 18.  The missed work time was based upon restrictions provided by Dr. Campbell when he opined that Ms. Kirouac was not able to work due to her medical conditions.  PSAMF ¶ 18; DRPSAMF ¶ 18. Dr. Campbell indicated that Ms. Kirouac was not able to work when given restrictions; yet he frequently released her to return to work without restrictions from 2005 to 2008.   DRPSAMF ¶ 18.   The Post Office was able to immediately accommodate Ms. Kirouac in relation to the periods of time she was restricted from working.  DRPSAMF ¶ 18.

When she was restricted from working, Ms. Kirouac frequently stayed in bed most of the day, often not even getting dressed or showering for four to five days. PSAMF ¶ 9; DRPSAMF ¶ 9.  When she remained at home, she often felt stationary and was typically immobilized, whether in bed or sitting on a couch or chair.

---

grounds for denying Ms. Kirouac's paragraph 9 boil down to a relevancy objection.  *See* FED. R. EVID. 401.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court overrules the Postmaster's objections and includes the statements in paragraph 9 because they are relevant to her argument that she has a disability.  *See Compl.* ¶¶ 401-11.

[18]     The Postmaster interposed a qualified response in order to complete the statement quoted from Terrence Dinneen's Vocational Report.  DRPSAMF ¶ 18.  The Court includes the Postmaster's clarification as it is supported by the record.  *See Report by Terrence B. Dinneen, M.S., C.R.C., C.R.E. on Kirouac, Cindy v. USPS, Case No 2:11-cv-00423-P-W* 1, 15 (ECF No. 112-1).

PSAMF ¶ 9; DRPSAMF ¶ 9.  She experienced prolonged periods of severe fatigue and a severe loss of energy.  PSAMF ¶ 9; DRPSAMF ¶ 9.  Also, during periods when Ms. Kirouac was restricted from working, she left her home infrequently except to walk her dogs.[19]  PSAMF ¶ 10; DRPSAMF ¶ 10.  She experienced severe trouble concentrating and if she sat with the television on, it was mostly for the sounds and she was not processing the content.  PSAMF ¶ 10; DRPSAMF ¶ 10.  She rarely read anything and experienced an acute loss of interest in normal activities.  PSAMF ¶ 10; DRPSAMF ¶ 10.  Ms. Kirouac also found that she was unable to remember simple conversations she had had with her fiancé.  PSAMF ¶ 10; DRPSAMF ¶ 10.  She frequently cried uncontrollably and had occasional suicidal thoughts.[20]  PSAMF ¶ 11; DRPSAMF ¶ 11.  She also ceased doing most of her basic household chores, such as food shopping, cooking, cleaning and laundry.  PSAMF ¶ 11; DRPSAMF ¶ 11.  Her fiancé performed most of these duties.  PSAMF ¶ 11; DRPSAMF ¶ 11.  Ms. Kirouac withdrew from most social interaction and only occasionally engaged with family members or friends.  PSAMF ¶ 11; DRPSAMF ¶ 11.

---

[19]  The Postmaster denied the statements in paragraph 10 on the grounds that they are vague, irrelevant, do not specify a relevant time period, are not supported by evidence that the Post Office knew she experienced these issues, and are contradicted by Dr. Campbell's February 26, 2008 letter. DRPSAMF ¶ 10.  Given the preceding statement of fact, the use of "also", and the record citation, the Court concludes "these periods" refer to times during 2005 to 2008 when Ms. Kirouac was on medically-restricted leave.  *See* PSAMF ¶¶ 9-10.  The Court also overrules the Postmaster's remaining relevance objections as the statements in paragraph 10 are relevant to Ms. Kirouac's argument that she has a disability.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.

[20]  The Postmaster denied this paragraph for the same reasons he denied paragraphs 9, 10, and 18.  DRPSAMF ¶ 11.  Given the placement of paragraph 11 in a string of statements made in connection with Ms. Kirouac's experiences while on periodic medically-restricted leave from 2005 to 2008, the Court concludes that the paragraph's timing is unambiguous.  Also, viewing the facts in the light most favorable to Ms. Kirouac, the Court determines that Ms. Kirouac's statements in paragraph 11 are relevant to her disability argument.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.

During the periods of time between 2005 and 2008, Ms. Kirouac's sleep was significantly impaired and she had significant difficulty falling asleep and staying asleep.[21]  PSAMF ¶ 12; DRPSAMF ¶ 12.  On average, she would sleep no more than four to five hours an evening.  PSAMF ¶ 12; DRPSAMF ¶ 12.  When Ms. Kirouac returned to work after taking periodic medically-sanctioned leave from 2005 to 2008, Ms. Kirouac's functioning improved at work but was still minimal or significantly reduced other than working.[22]  PSAMF ¶ 13; DRPSAMF ¶ 13.

### 3.   Discipline of Ms. Kirouac and Other Postal Employees Prior to June 13, 2008

Before June 13, 2008, Ms. Kirouac had been subject to discipline by Postmaster St. Andre.[23]  PSAMF ¶ 19; DRPSAMF ¶ 19.  Ms. Kirouac filed complaints of discrimination and retaliation against Postmaster St. Andre in 2005 and 2007.  PSAMF ¶ 19; DRPSAMF ¶ 19.  She filed a formal complaint of discrimination on November 22, 2007 alleging unlawful retaliation as well as sex

---

[21]   The Postmaster denied paragraph 12 for the same reasons he denied paragraphs 9, 10, and 18.  DRPSAMF ¶ 12.  The Court resolves the Postmaster's timing concerns by qualifying Ms. Kirouac's statement in paragraph 9 and by omitting "and continuing" from paragraph 12 because it is ambiguous.  The Court includes Ms. Kirouac's statements in paragraph 12 because they are relevant to her disability argument.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.

[22]   The Postmaster denied paragraph 13 for the reasons stated in his denials for paragraph 9, 10, and 18.  DRPSAMF ¶ 13.  The Court concludes that the temporal language included in paragraph 13 and the surrounding sentences adequately addresses the Postmaster's timing concerns.  Also, the Court concludes that paragraph 13 is relevant to her disability argument.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.

[23]   The Postmaster denied Ms. Kirouac's statements in paragraph 19 because they involve lay witness testimony, are conclusory, and are irrelevant as they do not relate to the incident on June 13, 2008.  DRPSAMF ¶ 19.  First, the Court omits the conclusory language in paragraph 19's first sentence, "relentless pattern."  Second, the Court concludes that Ms. Kirouac's statement involved permissible lay witness testimony because her opinion in her declaration—that she had been subject to discipline by Postmaster St. Andre—is rationally based on her perception, is relevant to determining pretext, and is not based on specialized knowledge.  *See* FED. R. EVID. 701.  Further, the Court concludes that Ms. Kirouac's statement is relevant even though it does not involve the events on June 13, 2008 because it supports the argument that she has a disability.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.

and disability discrimination, which included a hostile work environment claim. PSAMF ¶ 47; DRPSAMF ¶ 47.  On April 7, 2006, the Post Office's Equal Employment Opportunity (EEO) counselor, Lora Malloy, notified Postmaster St. Andre and Supervisor Anderson that Ms. Kirouac had filed an EEO claim of disability discrimination and retaliation relating to her February 17, 2006 removal from the Post Office by the police and a period of time in which she was barred from returning to work.[24]  PSAMF ¶ 20; DRPSAMF ¶ 20.  Ms. Malloy's notification was sent by e-mail at 10:15 a.m. on April 7, 2006.  PSAMF ¶ 20; DRPSAMF ¶ 20.

Following Ms. Malloy's e-mail to Postmaster St. Andre, that same day, a Lewiston Post Office supervisor, Louise Cote, checked on Ms. Kirouac's route and questioned her about her delivery times.[25]  PSAMF ¶ 21; DRPSAMF ¶ 21.  Ms. Kirouac believes that Supervisor Cote did this as an excuse to impose discipline. PSAMF ¶ 21; DRPSAMF ¶ 21.  Also, shortly after Ms. Malloy's notification, Postmaster St. Andre approached a letter carrier on his route and warned the

---

[24]    The Postmaster denied the first sentence of paragraph 20, which states: "[t]he discriminatory and retaliatory motivation of David St. Andre's harassment of Ms. Kirouac is highlighted by events that occurred on April 7, 2006."  PSAMF ¶ 20; DRPSAMF ¶ 20.  The Court agrees that this statement is conclusory and argumentative and omits it from paragraph 20.

[25]    The Postmaster denied paragraph 21 for the same reasons he objected to paragraph 19 and because the statement is conclusory and involves impermissible lay witness testimony.  DRPSAMF ¶ 21.  First, the Court agrees that some parts of paragraph 21 are argumentative and conclusory and strikes that offending language.  The Court also incorporates information from Ms. Cote's signed statement into paragraph 21 to explain why she followed Ms. Kirouac on her route. Ms. Cote's statement is not hearsay; it is the statement of an opposing party's employee.  *See* FED. R. EVID. 801(c) (defining hearsay as an out of court statement made to prove the truth of the matter asserted within the statement), 801(d)(2)(D) (stating that an opposing party's employee's statements made "on a matter within the scope of that relationship and while it existed" is not hearsay); *Kirouac Decl.* Attach 7, *Statement by Louise Cote* (ECF No. 104-8).  Further, the Court includes Ms. Kirouac's statement about the "purpose" of Ms. Cote's supervision but notes that the statement is Ms. Kirouac's opinion.

carrier that he should not speak to Ms. Kirouac.[26]  PSAMF ¶ 22; DSPSAMF ¶ 22.  A

note prepared by the carrier on April 7, 2006, reads:

> On today's date I was approached by Dave St. Andre on my route
> around 13:45.  He asked me where am I parked, I told him on Holland
> St.  He then asked me if I talked to Cindy this morning on the street.  I
> said Yes.  He later said I was seen doing this and I was timed talking
> to her.  I was seen by another person doing this.  He later said I should
> not be talking to her and that I was in a good position.  I assumed
> doing my job in a satisfactory manner.  I felt if I wanted to remain in a
> "good position," I should not talk to Cindy.

PSAMF ¶ 22; DRPSAMF ¶ 22.  Postmaster St. Andre also issued Ms. Kirouac

suspensions, including: two 7-day suspensions on June 19, 2007, two 14-day

suspensions on June 26, 2007, a Notice of Proposed Removal on July 24, 2007 for

---

[26]     The Postmaster denied paragraph 22 because the letter carrier's statement is unsworn, is
hearsay, lacks authenticity, and because Ms. Kirouac does not have first-hand knowledge of the
circumstances.   DRPSAMF   ¶ 22.   According to *Gomez-Gonzalez v. Rural Opportunities, Inc.*,
"unauthenticated, unsworn document[s] cannot be relied upon to defeat [a defendant's] motion for
summary judgment" especially when the statements in the documents are hearsay.  626 F.3d 654,
666 (1st Cir. 2010) (granting the defendant's motion for summary judgment because the plaintiff's
primary piece of evidence was an unsworn, unauthenticated e-mail, which the Court determined was
hearsay and irrelevant to issues in the case).
     This is another example of the type of evidentiary objection that the Court sought to avoid at
the Local Rule 56(h) conference.  Here, Ms. Kirouac referred to a handwritten note purportedly
written out by a Troy Bouchard, a Postal Service employee, which states that while on his route, he
was approached by Postmaster St. Andre who told him that if he wanted to remain in a good position
with the Postal Service, he should not to talk to Ms. Kirouac.  PRDSMF Attach. 8.  Ms. Kirouac put
Mr. Bouchard's note before the Court by referencing it in her sworn declaration.  *Id.* ¶ 22.  It is true
that Mr. Bouchard's handwritten note is hearsay.  *See* FED. R. EVID. 801(c).  At the same time, the
Court has no reason to conclude that if Mr. Bouchard were asked to sign a sworn declaration, he
would not repeat what he wrote.  Furthermore, Mr. Bouchard's recollection about what Postmaster
St. Andre told him would likely be admissible against the Postmaster.  *See Larch v. Mansfield Mun.
Elec. Dep't.*, 272 F.3d 63, 72 (1st Cir. 2001) (upholding the district court's evidentiary ruling because
although the defendant's employee's job description did not include threatening the manager of the
Electric Department, his statements were admissible under Rule 801(d)(2)(D) as "the statements
were related to a mater within the scope of his employment: oversight of the department").
     To blunt this type of objection, Ms. Kirouac should have anticipated it and provided a
properly sworn to statement from Mr. Bouchard in support of the asserted statement.  Nevertheless,
in these circumstances, where the Postmaster's objection appears to be more technical than
substantive, the Court has considered the contents of Mr. Bouchard's handwritten note.  If the
Postmaster concludes that by doing so, the Court committed a material evidentiary error, the
Postmaster may move for reconsideration.  If he does so, the Court will allow Ms. Kirouac the
opportunity to track Mr. Bouchard down and secure and file a duly sworn statement echoing what
Mr. Bouchard wrote out by hand.

crying when she received the two 14-day suspensions, and a 14-day suspension on October 9, 2007.[27]  PSAMF ¶ 23; DRPSAMF ¶ 23.

Supervisor Blouin issued a Notice of Removal to Ms. Kirouac on June 13, 2008; the only other two termination notices issued by the Post Office during a period from approximately 2006 to 2008 were issued for sexually touching or assaulting a female customer and stealing money.[28]  PSAMF ¶ 24; DRPSAMF ¶ 24. Supervisor Blouin testified that during that same period Ms. Kirouac was the only employee she issued a 14-day suspension to, but she noted that she had also issued a letter of removal to a Postal Service employee for attendance issues.[29]  PSAMF ¶ 25; DRPSAMF ¶ 25.  Supervisor Blouin issued 7-day suspensions to three other

[27]    The Postmaster denied the statements in paragraph 23 because they are conclusory, rely on impermissible lay witness testimony, and are not relevant to the current motion.  DRPSAMF ¶ 23. The Court agrees with the Postmaster that some of the language in paragraph 23 is argumentative and omits that language as well as the paragraph's last statement.  *See Daigle*, 794 F. Supp. 2d at 225 n.88; *Learnard*, 182 F. Supp. 2d at 119 n.3, 119-20.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court still includes the majority of paragraph 23 because it is relevant to her disability and pretext arguments.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.

[28]    The Postmaster denied paragraph 24 because it is vague on timing, irrelevant, argumentative, and does not accurately reflect the reasons for her termination.  DRPSAMF ¶ 24. First, the Court concludes that the admissible information in paragraph 24 is relevant to Ms. Kirouac's discrimination claims.  Further, given the record citation describing instances when other postal workers were issued Notices of Removal and Ms. Kirouac's version of the events on June 13, 2008, the Court assumes Ms. Kirouac is referencing a period from 2006 to 2008.  *See Dep. Tr. of David E. St. Andre* at 75:6-78:4 (ECF No. 105) (*St. Andre Dep.*) (confirming that the two incidents Postmaster St. Andre referenced occurred in either 2006 or 2007 and in 2008); *Kirouac Decl.* ¶¶ 51-55 Attach 18, *Kirouac Statements* at 5 (ECF No. 104-18).  Also, the Court omits argumentative language such as "grave offenses" and strikes Ms. Kirouac's asserted understanding of the reasons for her removal—crying and being emotional in front of the post office—from paragraph 24 because they are not supported by the record citation.  *See Daigle*, 794 F. Supp. 2d at 225 n.88; *Learnard,* 182 F. Supp. 2d at 119 n.3, 119-20.

[29]    The Postmaster denied the statements in paragraph 25 because they are vague on timing, irrelevant, and because Supervisor Blouin's testimony regarding notices of removal is inconsistent. DRPSAMF ¶ 25.  First, the Court concludes that the statements in paragraph 25 are relevant because they relate to Ms. Kirouac's pretext argument.  *See* FED. R. EVID. 401.  The Court omits the first statement in paragraph 25 because it is argumentative and includes "during that same period" in the second statement because the timing relates to the time period outlined in paragraph 24.  *See Daigle*, 794 F. Supp. 2d at 225 n.88; *Learnard*, 182 F. Supp. 2d at 119 n.3, 119-20.  Finally, the Court qualifies the statements about Supervisor Blouin's record of issuing notices of removal to reference one other situation where she issued a notice of removal.  *Blouin Dep. I* at 100:1-19.

15

employees; two for an intentional expansion of street time or deliberate slow-down as part of a coordinated union action and one when a carrier intentionally drove into a snow bank to park a new postal vehicle and "cracked the whole front end.  He said he knew there was a snow bank there; he didn't think it would have impacted the vehicle like it did."  PSAMF ¶ 25; DRPSAMF ¶ 25.

Supervisor Blouin testified that either in late 2006 or 2007, one of the carriers who was issued a 7-day suspension for what she considered a deliberate expansion of street time had previously been issued a letter of warning when she discovered he "left a relay can open and someone stole all the mail out."[30]  PSAMF ¶ 26; DRPSAMF ¶ 26.  Supervisor Blouin further testified that Postmaster St. Andre was aware of the carrier's action, stating:

> Well, the postmaster knew about it at the time because a customer called in and said the relay can was open.  Then [the carrier] called in and said, "I just went to the relay can.  All the mail is gone."  Then somehow it got into the newspaper.  So yes, the postmaster knew about that one.

PSAMF ¶ 26; DRPSAMF ¶ 26.  Supervisor Blouin testified that Postmaster St. Andre indicated to the union that he could issue the carrier "more discipline than a letter of warning for" his conduct with the relay can, but approved a letter of warning.[31]  PSAMF ¶ 27; DRPSAMF ¶ 27.  Supervisor Blouin testified that one of

---

[30]    The Postmaster interposed a qualified response to the statements made in paragraph 26 because the statements were made in approximately 2007, the mail carrier was suspended for deliberate slowdown of mail delivery, and the statements are irrelevant.  DRPSAMF ¶ 26.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court includes paragraph 26 because it is relevant to her pretext argument but includes the Postmaster's qualifications because they are supported by the record citation.  *See Blouin Dep. I* at 81:2-83:2.

[31]    The Postmaster interposed a qualified response because paragraph 27 does not state a relevant time period and is not relevant to the incident on June 13, 2008 or the Arbitrator's decision.  DRPSAMF ¶ 27.  The Court concludes that the Postmaster's timing concern is addressed by the

the other carriers who had been suspended had also previously been issued a letter of warning when she discovered that he had left his postal van open with the windows rolled down and unattended while delivering express mail in downtown Lewiston, stating:

> [The carrier] was nowhere in sight.  The windows were rolled down, there was Express Mail just laying all over the seat—you're supposed to have the vehicle locked and secured—the parking brake wasn't set and he was up on like the fourth floor delivering Express Mail.  But the vehicle wasn't secure at all.  Anybody could have taken the Express Mail out of the front seat.[32]

PSAMF ¶ 28; DRPSAMF ¶ 28.  Supervisor Blouin testified that she waited for the carrier to return and when he returned, he stated that he could see the vehicle and she responded, "You could not see it because you would have seen me standing here" and he did not see her standing there.[33]   PSAMF ¶ 29; DRPSAMF ¶ 29.  Supervisor Blouin testified that she informed Postmaster St. Andre that the carrier

---

[32]     changes it made to paragraph 26.  Also, viewing the facts in the light most favorable to Ms. Kirouac, the Court includes the statement because it is relevant to her pretext argument. *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.

[32]     The Postmaster interposes a qualified response because the timing of the statement is vague and the statement is irrelevant as Ms. Kirouac "offers no evidence whether or not those other matters reached the level of being upheld by a neutral arbitrator as 'just cause' for removal." DRPSAMF ¶ 28.  The Court first concludes that despite the Postmaster's objections, viewing the facts in the light most favorable to Ms. Kirouac, the information in paragraph 28 is relevant to her pretext argument.  Also, to ensure the accuracy of Ms. Kirouac's statement, the Court changes "had been issued a letter of warning" to "had been suspended" to accurately reflect the record citation.  *See Blouin Dep I.* at 84:25-85:22.  Finally, the lack of an exact date or time does not, in the Court's view, render the statement excludable.

[33]     The Postmaster interposed a qualified response making the same objections to paragraph 29 as he made to the statements in paragraph 28.  DRPSAMF ¶ 29.  For the same reasons previously noted, the Court, viewing the facts in Ms. Kirouac's favor, includes paragraph 29; however, the Court omits "for three to four minutes" because that timing is not supported by the record citation.  *See Blouin Dep. I* at 86:1-20.

"had his window rolled down" and that "[t]here was Express Mail on the front seat."[34]  PSAMF ¶ 30; DRPSAMF ¶ 30.

Some of Ms. Kirouac's coworkers believed she was being singled out and targeted for discipline for discriminatory motives, and some have completed statements to that effect.[35]  PSAMF ¶ 31; DRPSAMF ¶ 31.  Darin Baker, one of Ms. Kirouac's former coworkers, completed several written statements in which he expressed his belief that Post Office management:

    a.     has engaged and continues to engage in actions which are harassing and provoking in nature towards Ms. Kirouac;

    b.     has created a special disciplinary process specifically for Ms. Kirouac;

    c.     has stringently enforced rules with Ms. Kirouac while not enforcing these rules in an equitable manner with other employees in the same job position;

    d.     has engaged in conduct detrimental to her health; and,

    e.     are aware of her conditions of ADD, anxiety, PTSD and depression and have "not once" attempted to discuss these issues or "facilitate appropriate working conditions for the grievant."[36]

---

[34]    The Postmaster interposed the same qualified response for paragraph 30 as he made for paragraphs 28 and 29.  DRPSAMF ¶ 30.  For the same reasons the Court included paragraphs 28 and 29, the Court includes paragraph 30.

[35]    The Postmaster denied paragraph 31 because the record support for paragraph 31, exhibit 10 to Ms. Kirouac's Declaration, contains a series of sworn and unsworn statements and declarations which he argues are irrelevant to the events that occurred after Ms. Kirouac's return to work at the Post Office in March 2008.  DRPSAMF ¶ 31.  First, the Court concludes that the documents in exhibit 10 are relevant because they support Ms. Kirouac's pretext argument and her claim that Post Office management singled her out for discriminatory treatment because of her disability.  *See* FED. R, EVID, 401; *Compl.* ¶¶ 406-11.  Further, the Court declines to exclude paragraph 34 because exhibit 10 contains some unsworn statements as the sworn declarations in exhibit 10 support Ms. Kirouac's statement.  *See Kirouac Decl.* Attach 11, *Postal Worker Decls. and Statements* at 7-24 (ECF No. 104-11).

[36]    The Postmaster denied the statements in paragraph 32 because the cited declaration is undated, relies on lay opinion, and the remaining documents—an issue statement and two attachments—are unsworn unauthenticated hearsay.  DRPSAMF ¶ 32.  The Postmaster also argues that the statements are irrelevant to the current dispute.  DRPSAMF ¶ 32.  First, the Court

PSAMF ¶ 32; DRPSAMF ¶ 32.

### 4. Ms. Kirouac's September 2007 through March 2008 Medical Leave

On or about September 22, 2007, Ms. Kirouac went out on Family Medical Leave Act (FMLA) leave due to what she felt was  an aggravation of her major depression, panic disorder, anxiety disorder, and PTSD.[37]  PSAMF ¶ 33; DRPSAMF ¶ 33.  Ms. Kirouac's psychiatrist, Dr. Campbell, completed a FMLA medical certification form, stating that the leave was required due to: "Overwhelming emotional stress following apparent unrelenting scrutiny and unusual levels of harassing type supervision at work place"; however, Dr. Campbell stated that he did not recall meeting with anyone from the Post Office and that "[he] hadn't heard

---

concludes that the statements in paragraph 32 are relevant to Ms. Kirouac's pretext argument and her claim that Post Office management singled her out for discriminatory treatment because of her disability. *See* FED. R. EVID. 401; *Compl.* ¶¶ 406-11.  Second, the statements Darin Baker makes in his declaration satisfy Rule 701 because his statements appear to be (1) rationally based on his perception, (2) helpful to understand a fact in issue—whether Ms. Kirouac was discriminated against by management at the Post Office, and (3) are not based on any scientific, specialized, or technical knowledge.  FED. R. EVID. 701; *see Kirouac Decl.* Attach 12, *Decl. of Darin Baker* (ECF No. 104-12) (*Baker Decl.*).

Furthermore, as Mr. Baker's declaration confirms the statements in paragraph 32, the Court declines to exclude the paragraph simply because exhibit 11 contains "unsworn unauthenticated hearsay." The Court has considered these statements on the same basis that it considered Mr. Bouchard's handwritten statement.  The unsworn statements are technically hearsay and if the Postmaster wishes to move for reconsideration on this basis, the Court will allow Ms. Kirouac the opportunity to track down these individuals and present supporting documentation in affidavit form.

[37]    The Postmaster interposed a qualified response to paragraph 33 because Ms. Kirouac is not qualified to offer medical testimony about causation and does not cite any medical evidence to support her statement.  DRPSAMF ¶ 33.  The Court includes paragraph 33 because Ms. Kirouac's statement is permissible lay witness testimony because her statement—that she took leave because her medical conditions became aggravated—is (1) rationally based on her own perception, (2) helpful to understanding a fact in issue, and (3) is not based on any asserted specialized medical knowledge. *See* FED. R. EVID. 701.  Furthermore, the Court has slightly altered paragraph 33 to clarify that this paragraph is Ms. Kirouac's perception about why she left work in September 2007.

their point of view."[38]   PSAMF ¶ 34; DRPSAMF ¶ 34.   On January 18, 2008, Ms. Kirouac's physician, Dr. Pamela Ross, sent a letter to the Post Office stating that Ms. Kirouac remained under the care of a psychiatrist "for her continued panic disorder, anxiety and depression related to the Postal work environment.   She continues to have active symptoms so is unable to safely return to work at this time."   PSAMF ¶ 35; DRPSAMF ¶ 35.

On or about February 29, 2008, at Ms. Kirouac's request, Dr. Campbell revised a letter he wrote on February 26, 2008 releasing Ms. Kirouac to return to her employment at the Post Office by adding additional language to the letter.[39]

---

[38]      The Postmaster denied Ms. Kirouac's statement in paragraph 34 if it is offered for the truth of the matter asserted in the FMLA form and alternatively qualifies the paragraph if it is not offered for the truth.   DRPSAMF ¶ 34.   The Court includes Ms. Kirouac's paragraph 34 simply to reflect the statement Dr. Campbell made in the FMLA paperwork and treats the Postmaster's response as a qualification.   *See FMLA Form* (ECF No. 108-4).   Because the Postmaster's qualification is supported by the record, the Court includes it to clarify that Dr. Campbell did not meet anyone from the Post Office or listen to their point of view on Ms. Kirouac's work performance.   *See Dep. Tr. of Ronald Campbell, M.D.* at 28:17-29:21, 52:21-53:8 (ECF No. 111) (*Dr. Campbell Dep.*).

[39]      In paragraph 36, Ms. Kirouac introduces a second letter from Dr. Campbell, which contains all of the same information as the letter documented at ECF Nos. 88 and 111-5 except it includes a longer sentence in the second paragraph which states, "I feel that Cindy is emotionally able to return to work under the conditions set down in Section 58 of Page 12 of the 'Resolution of EEO Claim.'"   *Compare Dr. Campbell Feb. 2008 Ltr. I, with Ltr. from Dr. Campbell (Feb. 26, 2008)* (ECF No. 111-6) (*Dr. Campbell Feb. 2008 Ltr. II*).   The Postmaster denies paragraph 36 on the grounds that the second version of Dr. Campbell's letter is "unauthenticated unsworn hearsay without foundation" but notes that even if the Court considers the letter it does not require an eight hour work restriction for Ms. Kirouac.   DRPSAMF ¶ 36.   When asked about the two letters and the reason for their differences, Dr. Campbell stated, "I'm fine with the - - longer [letter].   I just don't know why there are two different documents" and that he did not understand what the larger legal significance of the longer letter would be.   *Dr. Campbell Dep.* at 65:20-69:4.

         In paragraph 39, Ms. Kirouac explains that there are two different letters with the same date—February 26, 2008—because she sought a modification of Dr. Campbell's February 26, 2008 letter and Dr. Campbell made the requested changes without changing the letter's date.   PSAMF ¶ 39.   The Postmaster objected to Ms. Kirouac's statement in paragraph 39 because she "proffers no foundation or first-hand knowledge for these assertions."   DRPSAMF ¶ 39.   Viewing the facts in the light most favorable to Ms. Kirouac, the Court credits her assertions in paragraph 39 because they reference firsthand knowledge of the facts.   To the extent that the Postmaster is objecting to Dr. Campbell's unsworn statement, the Court allows these paragraphs on the same basis as Mr. Bouchard's handwritten statement. If the Postmaster wishes to move to reconsider, the Court will allow Ms. Kirouac to obtain a sworn statement from the doctor.   Regarding the content of the letter,

PSAMF ¶¶ 36, 39; DRPSAMF ¶¶ 36, 39.   Dr. Campbell's second version of his

February 26, 2008 letter reads:

> Cindy Kirouac is in treatment with this office for Adult Attention
> Deficit Disorder, Major Depression, Anxiety and Panic Disorder as well
> as PTSD.
>
> I feel that Cindy is emotionally able to return to work under the
> conditions set down in Section 58 of Page 12 of the "Resolution of EEO
> Claim."
>
> Because of Cindy's Adult A.D.D. she will, at times, take longer to
> organize her route or to distribute her mail on the street.  This should
> be negligible but she may take a little longer than the prescribed time
> and go over 8 hours per day or over 40 hours per week to complete her
> route.  The medication that Ms. Kirouac takes for this condition has
> been very effective in helping her focus and be less distractible.

PSAMF ¶¶ 36, 39; DRPSAMF ¶¶ 36, 39.   "Section 58 of Page 12 of the 'Resolution of

EEO Claim'", referenced in Dr. Campbell's second letter, states:

> I.    Equal treatment of Ms. Kirouac by the managers and
> supervisors of the Lewiston Post Office, including the Lewiston
> Postmaster (presently David St. Andre) and any OIC assigned to
> Lewiston.  "Equal treatment" means:
>
> - No singling out or targeting of Ms. Kirouac for counseling or
>   disciplinary-related actions on a basis, or in a manner, that
>   differs materially from the discipline and counseling imposed on
>   other employees;
> - USPS managers and supervisors will not yell or use raised
>   voices during their interactions with Ms. Kirouac;
> - A union steward will be present during all performance
>   counseling and disciplinary discussions with Ms. Kirouac;
> - Compliance with federal non-retaliation and harassment
>   statutes and regulations.
>
> II.   Michael Anderson will not be assigned to supervise Ms. Kirouac
> except on an emergency basis (defined as no other supervisor being
> present or available in the facility to supervise Ms. Kirouac).  Michael

---

the doctor would be allowed to give his expert opinion as to the proper work restrictions for his
patient and to the extent the Postmaster is objecting on that basis, the Court overrules the objection.

Anderson will also not be consulted concerning Ms. Kirouac's supervision and will not provide any direction to other supervisors concerning their management of Ms. Kirouac.

III.    The USPS will provide reasonable accommodations for the work limitations Ms. Kirouac's medical provider has indicated for her conditions of Major Depression, anxiety, panic attacks, and post-traumatic stress disorder (PTSD) [ ]

IV.    The USPS will provide reasonable accommodations for Ms. Kirouac's AD[]D condition, including:

- Provide written job instructions and checklists;
- Provide an appropriate amount of time to learn new responsibilities.

V.    Training for Lewiston USPS managers and supervisors (including 204Bs) in EEO issues, including non-retaliation for protected activity, harassment, disability discrimination and reasonable accommodations under the Rehabilitation Act.[40]

PSAMF ¶ 37; DRPSAMF ¶ 37.   The second version of the February 26, 2008 medical release was forwarded to the Post Office's in-house counsel, Anna Crawford.[41]   PSAMF ¶ 38; DRPSAMF ¶ 38.   Shortly thereafter, Ms. Crawford conveyed to Ms. Kirouac that the Post Office and/or the District of Maine would not agree to Ms. Kirouac's return to work with the medical restrictions noted in the Dr.

---

[40]    The Postmaster denied paragraph 37 because the document is "unauthenticated unsworn hearsay without foundation" and is irrelevant.   DRPSAMF ¶ 37.   For the reasons articulated in paragraph 36, the Court includes the statements in paragraph 37 because they are incorporated into Dr. Campbell's second letter made on or about February 29, 2008.   *See* PSAMF ¶¶ 36, 39.   To the extent the Postmaster is objecting to the unsworn nature of the statements, the Court will entertain a motion for reconsideration with the proviso that Ms. Kirouac will be allowed to obtain sworn statements.   Finally, the Court determines that the information in paragraph 37 is relevant to Ms. Kirouac's disability discrimination claim and excludes the Postmaster's statement that even the EEO Claim sheet does not restrict how many hours Ms. Kirouac can work because it is argumentative.   *See* FED. R EVID. 401; DRPSAMF ¶ 37.

[41]    The Postmaster denied paragraph 38 for the reasons it denied paragraph 36 and because the statements are irrelevant and lack an adequate foundation.   DRPSAMF ¶ 38.   First, the Court has already overruled the Postmaster's objections to Ms. Kirouac's statement in paragraph 36 and for the same reasons it overrules the Postmaster's objections here.   Next, as Ms. Kirouac's statements in paragraph 38 are based on her sworn affidavit and the Court must view the facts in her favor, it admits the statements in paragraph 38.

Campbell's second version of the medical release letter.  PSAMF ¶ 38; DRPSAMF ¶ 38.  Ms. Crawford further indicated that the agency would permit Ms. Kirouac to return to work if the middle paragraph of the note were modified to release her to work without limitations.  PSAMF ¶ 38; DRPSAMF ¶ 38.  The Post Office's position regarding the work limitations noted in Dr. Campbell's second version of his February 26, 2008 work release is confirmed by an e-mail dated March 3, 2008 from Postmaster St. Andre to Kevin Clark, his Manager of Post Office Operations, in which he stated:

> 1)   Cindy's latest medical documentation states that she cannot return to work until the "hostile environment" has been eliminated. No such environment has been proved to exist.  Her idea of this is when a supervisor instructs her in the performance of her duties or holds her accountable for her performance.  This is not going to change. She is still going to be held accountable and still be instructed in the performance of her duties.  Everyone involved needs to understand this.
>
> 2)   I believe we need medical documentation releasing her to RTW in spite of the fact that nothing has changed.
>
> 3)   Mike Anderson will be returning to duty at Lewiston on March 10th.  Cindy has repeatedly stated that she will not talk to or follow any instructions from this supervisor.  This is unacceptable.  What is your recommendation?[42]

PSAMF ¶ 40; DRPSAMF ¶ 40.

---

[42]   The Postmaster denied paragraph 40 because it is irrelevant and there is no evidence beyond Ms. Hansen's Declaration to connect Dr. Campbell's second version of the February 26, 2008 letter and Postmaster St. Andre's e-mail on March 3, 2008.  DRPSAMF ¶ 40.  First, the Court concludes that the contents of paragraph 40 are relevant to Ms. Kirouac's pretext argument.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.  Next, despite the Postmaster's objection to a lack of connection between the letter and Postmaster St. Andre's e-mail, Ms. Kirouac does not attempt to directly link the two documents but includes the letter to establish the Post Office's "position" towards the type of restrictions listed in Dr. Campbell's second version of the February 26, 2008 letter.  *See* PSAMF ¶ 40. Viewing the facts in the light most favorable to Ms. Kirouac, the Court includes paragraph 40.

### 5.    Ms. Kirouac's May 2008 Suspension from Work and Other Work Events Leading up to June 13, 2008

On three dates in May 2008, a postal attorney, Anthony Rice, traveled to the Post Office to interview employees concerning Ms. Kirouac's pending EEO claim of retaliation, discrimination, and hostile work environment.   PSAMF ¶ 48; DRPSAMF ¶ 48.   The dates of Attorney Rice's interviews were May 13, 14, and 28, 2008.   PSAMF ¶ 48; DRPSAMF ¶ 48.   The day after Attorney Rice's last day of investigatory interviews, May 29, 2008, Postmaster St. Andre was observed at the Post Office for a meeting.[43]   PSAMF ¶ 49; DRPSAMF ¶ 49.   The next day, May 30, 2008, Supervisor Anderson was assigned to supervise Ms. Kirouac for the first time since mid-March 2008.[44]   PSAMF ¶ 50; DRPSAMF ¶ 50.   Due to the manner of his interactions with Ms. Kirouac, she began to experience a panic attack and went to

---

[43]    The Postmaster denied the statements in paragraph 49 because they are based on impermissible lay testimony and because the second statement is argumentative and conclusory. DRPSAMF ¶ 49.  The Court refuses to accept Ms. Kirouac's second statement in paragraph 49—"[a]n immediate resumption of the targeted harassment and discipline of Ms. Kirouac resumed following St. Andre's appearance at the Lewiston Post Office on May 29, 2009, as detailed in paragraph 268 to 295 of the complaint"—because it is argument, not fact. *See Daigle*, 794 F. Supp. 2d at 225 n.88; *Learnard,* 182 F. Supp. 2d at 119 n.3, 119-20.  Yet, the Court includes Ms. Kirouac's first statement over the Postmaster's lay witness testimony objection because it is supported by the record citations and comports with Rule 701.  *See* FED. R. EVID. 701.

[44]    The Postmaster denied the statements in paragraph 50 because they are conclusory, argumentative, are not supported by medical documentation, rely on impermissible lay witness testimony and because the Post Office was not aware of Ms. Kirouac's panic attack.  DRPSAMF ¶ 50.  The Postmaster also argues that the last statement on paragraph 50 constitutes "inadmissible unsworn hearsay."  DRPSAMF ¶ 50.  First, although OIC Curtis' deposition testimony does not support the fact that Supervisor Anderson was "assigned to supervise Ms. Kirouac for the first-time since mid-March 2008" on May 30, 2008, it is supported by Ms. Kirouac's sworn declaration.  *See Kirouac Decl.* ¶ 36; *Curtis Dep*. at 92:13-94:8.  Second, Ms. Kirouac's sworn declaration is permissible lay opinion testimony which supports her statement that she began to experience a panic attack after interacting with Mr. Anderson.  *See* FED R. EVID. 701; *Kirouac Decl.* ¶ 36.  Finally, regarding Anne Houston's unsworn statements, the Court will proceed as it did with the unsworn statement of Mr. Bouchard.  If the Postmaster wishes the Court to reconsider its Order based on the unsworn nature of Ms. Houston's statement, the Court will allow Ms. Kirouac to track down Ms. Houston and obtain a sworn declaration.  Finally, the Court alters some of the language in the last statement to accurately reflect Ms. Houston's comments.  *See Kirouac Decl.* ¶ 37 Attach 15, *Statement of Anne Houston* (ECF No. 104-15).

the restroom.  PSAMF ¶ 50; DRPSAMF ¶ 50.  An employee who witnessed the interactions, Anne Houston, prepared a statement indicating that Supervisor Anderson was attempting to aggravate the situation and that she thought "he was trying to push [Ms. Kirouac] over the edge."  PSAMF ¶ 50; DRPSAMF ¶ 50.

When Ms. Kirouac delivered her route on May 30, 2008, both Supervisor Anderson and Supervisor Blouin went out in a vehicle to monitor or conduct surveillance on her.  PSAMF ¶ 51; DRPSAMF ¶ 51.  On May 31, 2008, Supervisor Anderson closely monitored Ms. Kirouac in the Post Office.[45]   PSAMF ¶ 52; DRPSAMF ¶ 52.  Ms. Kirouac began to experience a panic attack, began crying, and left for the restroom.  PSAMF ¶ 52; DRPSAMF ¶ 52.  On June 3, 2008, the Post Office held a Pre-Disciplinary Investigation (PDI) with Ms. Kirouac concerning the events of May 30, 2008.[46]  PSAMF ¶ 53; DRPSAMF ¶ 53.  A PDI is conducted when Postal Service management needs to question an employee about an issue that could lead to discipline.[47]   DSMF ¶ 14; PRDSMF ¶ 14.   When management determines the need for a PDI, the employee is advised of the reason for the investigation and that it could potentially lead to discipline.  DSMF ¶ 14; PRDSMF

---

[45]    The Postmaster interposed a qualified response to paragraph 52 because "closely monitored" is conclusory, there is no evidence that the Post Office knew Ms. Kirouac was suffering from a panic attack, and because there is no evidence that the Post Office was doing anything beyond routine supervision.  DRPSAMF ¶ 52.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court admits the contents of paragraph 52, including the "closely monitored" language, as the statements are supported by the record.  *See Kirouac Decl.* ¶ 39.

[46]    The Postmaster interposed a qualified response because "[a]t the time, Kirouac was working at the Postal Service without medical restrictions, as provided in Dr. Campbell's letter."  DRPSAMF ¶ 53.  As the qualification is supported by the record, the Court includes it.

[47]    Ms. Kirouac interposed a qualified response to paragraph 14 because "[t]he PDI process can be abused and misapplied, as it was with Ms. Kirouac."  PRDSMF ¶ 14.  Because the Postmaster simply explains what a PDI is in paragraph 14 and the process it involves rather than how it functioned in Ms. Kirouac's case, the Court declines to incorporate Ms. Kirouac's qualification.  *See* DSMF ¶ 14; PRDSMF ¶ 14.

¶ 14.  A PDI offers the employee the opportunity to explain his or her position and provide answers relating to the matter, which allows the management official to make an informed decision about whether to issue discipline and, if so, the appropriate level of any discipline.   DSMF ¶ 14; PRDSMF ¶ 14.   Upon the employee's request, the employee may have union representation during a PDI. DSMF ¶ 14; PRDSMF ¶ 14.   During Ms. Kirouac's June 3, 2008 PDI, her union representative discussed her work-related medical conditions of panic disorder and PTSD, and her need to go to the restroom for those conditions even though Dr. Campbell's letter released Ms. Kirouac to work without restrictions.  PSAMF ¶ 53; DRPSAMF ¶ 53.

On June 4, 2008, the Post Office issued Ms. Kirouac a 14-day suspension for "Failure to Satisfactorily Perform Your Duties as a Letter Carrier," due to a number of alleged issues.  PSAMF ¶ 55; DRPSAMF ¶ 55.  The Notice of 14-day Suspension stated:

> Specifically, on May 30, 2008, you were instructed and then directly ordered by Mike Anderson, Supervisor, Customer Services to resume working after you failed to acknowledge your daily expectations and stopped working completely until you could speak to the postmaster or union official. You then left your case and went downstairs without permission for 16 minutes.  On May 31, 2008, on two separate occasions after clocking in, you were noticed by a supervisor speaking with the union steward for several minutes without requesting the time to do so. You were also told to only use the vending machines downstairs before clocking in as previously instructed on several occasions. The union steward informed Mike Anderson that you do this almost daily.  Later that morning, you again left your case and went downstairs for 20 minutes without requesting permission. On June 2, 2008 you again failed to properly perform your msp scans. You have been instructed and spoken to about this issue 16 times over the past 3 months.

26

> On March 20, 2008 there was a meeting held involving you Tim
> Perkins (NALC steward), myself, and Mitchell C. Curtis (OIC) to
> discuss expectations following a PDI on March 18, 2008 for ignoring
> specific instructions from a supervisor concerning when to meet with
> the union steward and various performance problems. During this
> meeting, which you left without permission for 11 min., you indicated
> you completely understood the following expectations: Follow all
> supervisor instructions, unless unsafe, period. Any dispute would be
> resolved after following the instructions. Scan all collection boxes,
> MSP points, and appropriate accountables. Put away all personal
> items and be at the time clock ready to work at 0730 hrs. Do not
> request special treatment different from the other city carriers such as
> permission to speak to the union every time a supervisor asks
> questions or issues instructions. Perform all facets of your job in a
> professional manner even when there is no one watching you.[48]

PSAMF ¶ 55; DRPSAMF ¶ 55. Ms. Kirouac states that she left the workroom floor

on May 30 and May 31, 2008 due to panic attacks. PSAMF ¶ 55; DRPSAMF ¶ 55.

On June 10, 2008, as a result of the 14-day suspension, Attorney Robin

March, Ms. Kirouac's lawyer, sent a letter to the Post Office on Ms. Kirouac's behalf

requesting that the accommodations detailed in Dr. Campbell's second version of

the February 26, 2008 medical release be implemented and stating in part:

> This letter is in response to the June 4, 2008, 14 day suspension issued
> to Cindy Kirouac. This action is extremely disheartening in view of
> Ms. Kirouac's successful return to work and the three month period in
> which she was able to work at the Lewiston Post Office without
> incident. During that period, Supervisor Mike Anderson was
> apparently kept contained. We are not certain why or how he was
> given a "green light" to resume his targeted harassment of Ms.

---

[48] The Postmaster denied paragraph 55 citing the language in the Notice of 14-day Suspension
because there is no medical evidence to support Ms. Kirouac's assertion that her conduct was due to
a panic attack and because "minor" makes the paragraph conclusory. DRPSAMF ¶ 55. Because
both parties cite the Notice of 14-Day Suspension, the Court includes the information in the Notice
and omits "minor" as it is argument, not fact. *See Daigle,* 794 F. Supp. 2d at 225 n.88; *Learnard,* 182
F. Supp. 2d at 119 n.3, 119-20 (D. Me. 2000); *Notice of 14-Day Suspension* (ECF No. 104-16).
Further, viewing the facts in the light most favorable to Ms. Kirouac, the Court includes Ms.
Kirouac's statement that the reason she left the workroom floor on two occasions mentioned in the
Notice was because of panic attacks. *See Kirouac Decl.* ¶ 42.

> Kirouac. The resumption of the badgering of Ms. Kirouac occurred almost immediately after Postmaster David St. Andre returned to the Lewiston Post Office for a meeting with Lewiston supervisors. . . .
>
> The USPS has been provided with voluminous medical documentation concerning Ms. Kirouac's accepted work injuries and medical conditions of Major Depression, anxiety, panic attacks, and post-traumatic stress disorder (PTSD).  She has requested reasonable accommodations for her conditions which the agency continues to disregard.  She is reiterating her request for accommodations for her psychiatric conditions.  We are requesting that Supervisor Anderson have no interaction with Cindy Kirouac and that the work terms we detailed to the agency prior to Ms. Kirouac's return to work be implemented, specifically: . . . .[49]

PSAMF ¶ 56; DRPSAMF ¶ 56.  Following the receipt of her 14-day suspension, Ms. Kirouac took three days of sick leave and returned to work on June 10, 2008.[50] PSAMF ¶ 57; DRPSAMF ¶ 57.   Upon her return to work, Ms. Kirouac was monitored by Supervisors Anderson and Blouin.  PSAMF ¶ 57; DRPSAMF ¶ 57.  On the first day of her return, OIC Curtis gave Ms. Kirouac the fax number for the District of Maine's Occupational Health Nurse Administrator (OHNA) to enable her to fax her medical work release to OHNA.[51]  PSAMF ¶ 58; DRPSAMF ¶ 58.  When

---

[49]      The Postmaster denied the statements in paragraph 56 as hearsay if they are offered for the truth but otherwise interposed a qualified response to the paragraph because Dr. Campbell released Ms. Kirouac to work without restrictions and the proposed restrictions in Dr. Campbell's first version of the February 2008 letter, which was not accepted by the Post Office, did not authorize Ms. Kirouac to disregard a supervisor's order. DRPSAMF ¶ 56.  The Court agrees that Attorney March's letter is not admissible for the truth of its contents; however, it is admissible to the extent it placed the Postmaster on notice of Ms. Kirouac's complaints and her requests for accommodation.

[50]      The Postmaster denied paragraph 57 because it is based on impermissible lay testimony and conclusory allegations.  DRPSAMF ¶ 57.  First, the Court permits Ms. Kirouac's statements in paragraph 57 as they are supported by her declaration and comport with Rule 701's requirements for lay witness opinion testimony.   *See* FED. R. EVID. 701.  Yet, the Court omits the argumentative language in the second statement, such as "placed under surveillance" and "every move scrutinized and monitored", and rephrases the statement to reflect that Ms. Kirouac was monitored by her supervisors at work because that fact is supported by the record citation.  *See Daigle*, 794 F. Supp. 2d at 225 n.88; *Learnard*, 182 F. Supp. 2d at 119 n.3, 119-20; PSAMF ¶ 57; *Kirouac Decl.* ¶ 44.

[51]      The Postmaster denied paragraph 58 because Ms. "Kirouac offers no factual detail of what she means by 'monitor.'"  DRPSAMF ¶ 58.  Viewing the facts in the light most favorable to Ms.

Ms. Kirouac went to fax the note, Supervisor Anderson followed her into the room to monitor her.  PSAMF ¶ 58; DRPSAMF ¶ 58.

On June 12, 2008, the Post Office held a PDI with Ms. Kirouac, this time for an "unauthorized leaving" of the workroom floor when she went to fax the medical note to OHNA and brought back limited mail on June 10, 2008.[52]  PSAMF ¶ 59; DRPSAMF ¶ 59.  During the PDI, Ms. Kirouac indicated that she brought the mail back because she was a "Medical 8", which meant that she could not work over eight hours; however, Dr. Campbell's letter stated that she had no medical restrictions and could work over eight hours.  PSAMF ¶ 59; DRPSAMF ¶ 59.  Supervisor Blouin instructed Ms. Kirouac not to work over eight hours and that she would verify with OHNA what her medical restriction was.  PSAMF ¶ 59; DRPSAMF ¶ 59. Supervisor Anderson and Supervisor Blouin contacted the office of OHNA on June 12, 2008 with an inquiry concerning Ms. Kirouac's work restrictions.  PRDSMF ¶ 7. Supervisor Blouin was instructed by OHNA that Ms. Kirouac should provide updated medical information if anything had changed with her condition.[53]  PSAMF ¶ 60; DRPSAMF ¶ 60.  The e-mail from OHNA stated:

---

Kirouac, the Court includes the statements in paragraph 58 because they are supported by the record.  *See Kirouac Decl.* ¶ 45.

[52]   The Postmaster denied the statements in paragraph 59 if they are offered for the truth and otherwise qualifies the statements because they are irrelevant and Ms. Kirouac was not a Medical 8. DRPSAMF ¶ 59.  The Court considers Ms. Kirouac's statements in paragraph 59 to be for the truth of the matter asserted within them and includes them because they are supported by the record citation and relevant to Ms. Kirouac's argument that she has a disability.  *See* FED. R. EVID. 401; *Kirouac Decl.* ¶ 46 Attach 17, *PDI on June 12, 2008* (ECF No. 104-17).  The Court also incorporates the Postmaster's qualifications—that Ms. Kirouac was not subject to medical restrictions or a Medical 8—because they are supported by the record citation.  *See Dr. Campbell Ltr. Feb. 2008 I*; *E-mail from Debbi L. Murphy to Michael P. Anderson (June 12, 2008, 1:07 PM)* (ECF No. 106-2).

[53]   The Postmaster interposed a qualified response to paragraph 60 as the e-mail also stated that Ms. Kirouac was not restricted to an eight hour day five days a week.  DRPSAMF ¶ 60.  As the Postmaster's qualification is supported by the record, the Court includes the contents of the June 12,

29

> Re: Cindy Kirouac – based on her most recent medical documentation dated February 28, 2008, she has no work restrictions.  In fact her doctor states that it may take her more than 8 hours a day and she may go over 40 hours a week to complete her route.  There is no indication that she is restricted in any way to only 8 hours a day/40 hrs per week.  Cindy should be advised to provide updated medical documentation if anything has changed.  Thank you.

PSAMF ¶ 60; DRPSAMF ¶ 60.  Neither Supervisor Blouin nor OIC Curtis conveyed to Ms. Kirouac the instruction to provide updated medical information if anything had changed with her condition; however, on June 13, 2008, OIC Curtis asked Ms. Kirouac whether she had submitted any new medical documentation.[54]  PSAMF ¶ 61; DRPSAMF ¶ 61.

### 6.     The Incident on June 13, 2008

During the weeks leading up to June 13, 2008, Ms. Kirouac periodically demonstrated her ability to successfully perform her mail carrier duties, even when it required her, on occasion, to work more than eight hours per day.  DSMF ¶ 6; PRDSMF ¶ 6; PSAMF ¶ 45; DRPSAMF ¶ 45.[55]  OIC Curtis testified that Ms. Kirouac performed in a productive manner as a carrier, her delivery numbers were

---

2008 e-mail from Nurse Murphy to Supervisor Anderson.  *See E-mail from Debbi L. Murphy to Michael P. Anderson (June 12, 2008, 1:07 PM)* (ECF No. 106-2).  The Court also notes that the e-mail most likely incorrectly reports the date on Dr. Campbell's February 26, 2008 letter as February 28, 2008.  *Compare id., with Dr. Campbell Ltr. Feb. 2008 I.*

[54]     The Postmaster denied paragraph 61 because OIC Curtis asked Ms. Kirouac whether she had submitted any new medical documentation on June 13, 2008.  DRPSAMF ¶ 61.  The Court includes Ms. Kirouac's statement in paragraph 61 because the fact that Supervisor Blouin and OIC Curtis did not instruct Ms. Kirouac to update her medical information is supported by the record.  *See Blouin Dep. II* at 243:20-244:21; *Curtis Dep. II* at 200:9-23.  Yet, the Court includes the Postmaster's qualification to clarify that OIC Curtis asked Ms. Kirouac about whether she had any new medical restrictions on June 13, 2008.  *See Curtis Dep. II* at 200:9-23.

[55]     The Postmaster interposed a qualified response to Ms. Kirouac's paragraph 45 because the parties agree that Ms. Kirouac performed her job duties satisfactorily during the weeks leading up to June 13, 2008.  DRPSAMF ¶ 45.  The Court reviewed the record citation and determines that the dates in Ms. Kirouac's paragraph and the description in the last statement of her work performance as "extremely good" are not supported by the record citation.  *See Curtis Dep. II* at 87:1-88:25.  The Court omits the unsupported portions of paragraph 45.

good, and her interactions with her supervisor and coworkers were good.  PSAMF ¶ 45; DRPSAMF ¶ 45.  In a memo concerning her performance, OIC Curtis wrote that Ms. Kirouac's performance of her job duties was "safe" and "professional", and on one particular day was "exceptional."  PSAMF ¶ 45; DRPSAMF ¶ 45.

Supervisor Blouin testified that during the period from the middle of March 2008 until the end of May 2008, Ms. Kirouac's job performance was very good.[56] PSAMF ¶ 46; DRPSAMF ¶ 46.  She said that Ms. Kirouac delivered her mail in an efficient and timely manner.  PSAMF ¶ 46; DRPSAMF ¶ 46.  Supervisor Blouin also stated, "[Ms. Kirouac] was getting out in a reasonable time, she was finishing her route and coming back on time."  PSAMF ¶ 46; DRPSAMF ¶ 46.  Supervisor Blouin testified that during a period of changed management, Ms. Kirouac was cooperative, helpful, there were times she was under projections, and during their daily morning discussions concerning mail volume and expectations, she was flexible and cooperative.  PSAMF ¶ 46; DRPSAMF ¶ 46.  Supervisor Blouin noted that during this period, Ms. Kirouac appeared happy to be at work and there were no issues or problems with her performance or conduct.  PSAMF ¶ 46; DRPSAMF ¶ 46.

### a.    The Postmaster's Termination Notice

In a Notice of Removal, Supervisor Blouin described the events that occurred on June 13, 2008 at the Lewiston Post Office and the reasons for Ms. Kirouac's

---

[56]    The Postmaster interposed a qualified response to paragraph 46 citing the same reasons he qualified paragraph 45.  DRPSAMF ¶¶ 45-46.  The Court alters the dates slightly in paragraph 46 to accurately reflect the record and omits "cased other carriers' mail routes" as it is not supported by the record citation.  *See Blouin Dep. II* at 182:6-10, 185:10-14.

termination as a mail carrier.[57]   DSMF ¶ 8; PRDSMF ¶ 8.  According to the Postal Service, on June 13, 2008, Ms. Kirouac returned to the office from delivering her route at approximately 15:40, bringing back the last sixteen deliveries of her route. DSMF ¶ 8.  She had not requested a PS Form 3996 that morning indicating that she needed assistance on the street and had not contacted management during the day to inform them that she would not be able to complete her route. DSMF ¶ 8. While she was unloading her van, Supervisor Blouin instructed her to take the mail that she had brought back and finish her route.  DSMF ¶ 8.  She replied, "I'm not going to do it.  Your direct order does not override my doctor's authority, do you understand?"  Supervisor Blouin stated Ms. Kirouac, "I am giving you a direct order to finish your route."  DSMF ¶ 8.  Ms. Kirouac replied in a very loud and angry voice: "I will not do that, do you hear me?"  DSMF ¶ 8.  Ms. Kirouac then began to throw trays and equipment around the inside of her postal vehicle.  DSMF ¶ 8. Supervisor Blouin reported Ms. Kirouac's actions to the Postmaster.  DSMF ¶ 8.

The Postmaster then approached Ms. Kirouac and instructed her to finish her route.  DSMF ¶ 8.  She refused, stating that she was under medical restrictions not to work more than eight hours.  DSMF ¶ 8.  The Postmaster then obtained Ms.

---

[57]    In paragraph 8, the Postmaster included excerpts from its Notice of Removal, "which includes a discussion of events that occurred in Lewiston on June 13, 2008" and the "reasons" for Ms. Kirouac's Emergency Placement. DSMF ¶ 8.  Ms. Kirouac denied the information contained in the Notice of Removal as it is "in many respects false or distorted."  PRDSMF ¶ 8; *Kirouac Decl.* ¶¶ 51-55.  Here, Ms. Kirouac's denial misses the point.  In paragraph 8, the Postmaster sets forth the reasons the Postal Service gave for its removal of Ms. Kirouac.  DSMF ¶ 8.  Ms. Kirouac obviously disagrees with the Postal Service's bases for its action, but the paragraph is only attempting to establish the contemporaneous reasons for its actions.  Whether these reasons were in fact false and pretextual are the factual and legal issues driving this lawsuit.  The Court sets forth the contents of the Postal Service's termination notice, recognizing that Ms. Kirouac disputes not the fact that the Postal Service gave her this notice but the truth of its contents.

Kirouac's medical restrictions, which did not impose any medical restrictions. DSMF ¶ 8.  As the Postmaster approached Ms. Kirouac, she started to wave her arms and said loudly, "Get away from me.  I don't want to talk about it anymore. I've had it!"  DSMF ¶ 8.  The Postmaster informed Ms. Kirouac that she was to leave the building immediately under the Emergency Placement procedure in the National Agreement.  DSMF ¶ 8.  Ms. Kirouac refused to leave the workroom floor and stayed in the building for approximately fifteen to twenty additional minutes, ignoring further instructions to leave.  DSMF ¶ 8.  She finally left the building after the Union President informed her that he would not speak with her.  DSMF ¶ 8.

## b.    Ms. Kirouac's Version

Ms. Kirouac recalls the events of June 13, 2008 much differently than Supervisor Blouin and OIC Curtis.[58]  PSAMF ¶ 65; DRPSAMF ¶ 65.  On June 13, 2008, Ms. Kirouac returned to the Post Office sometime after 3:50 after delivering her route and brought back the last sixteen deliveries.[59]  DSMF ¶ 8; PRDSMF ¶ 8;

---

[58]    The Postmaster denies the facts underlying Ms. Kirouac's version of the events of June 13, 2008.  DRPSAMF ¶ 65.  First, he asserts that a neutral Arbitrator concluded there was "just cause" for the Postal Service to remove Ms. Kirouac from employment based on the events of June 13, 2008. DRPSAMF ¶ 65.  This objection is frivolous.  The Arbitrator's ruling is not conclusively binding on the facts before the Court and the Court is required to view the facts in the light most favorable to Ms. Kirouac.  Next, the Postmaster denies this paragraph because he asserts that the record support—exhibit seventeen—is inadmissible unsworn hearsay.  DRPSAMF ¶ 65.  First, the record support is Ms. Kirouac's own affidavit, which is admissible since she was an eyewitness and participant in the events.  Furthermore, to the extent the statements rely on Ms. Kirouac's contemporaneous notes, the prior statement is likely admissible under Rule 801(d)(1) because it rebuts an implied charge of recent fabrication.  FED. R. EVID. 801(d)(1)(B).

[59]    In paragraph 8, the Notice of Removal listed Ms. Kirouac's arrival time as "approximately 15:40 [3:40]", which she disputes.  PRDSMF ¶ 8; *Kirouac Decl.* ¶ 53.  In her sworn declaration, Ms. Kirouac states that she "clocked back in after 3:50 p.m." and that she returned to the post office at 3:57 p.m.  *Kirouac Decl.* ¶¶ 49, 53.  Given the conflicting times and viewing the facts in the light most favorable to Ms. Kirouac, the Court has changed her time of arrival to "sometime after 3:50."

The Postmaster interposed a qualified response to the statements in paragraph 62 because there is no evidence that Ms. Kirouac was a Medical 8 on June 13, 2008, the facts are irrelevant to the Notice of Removal, and a neutral arbitrator decided that the Post Office had just cause for her

PSAMF ¶¶ 62, 64; DRPSAMF ¶¶ 62, 64.  She finished the Dove park and loop but still had the drive and dismount left to deliver.  PRDSMF ¶ 8.  Ms. Kirouac determined that she would not be able to finish the drive and dismount, drive back, clear, and go within eight hours.  PRDSMF ¶ 8; PSAMF ¶ 62; DRPSAMF ¶ 62.  At approximately 3:40 p.m., she estimated it would take her fifteen to twenty minutes over her eight hours to finish her route, and thought she needed to get approval to finish it.  PRDSMF ¶ 8; PSAMF ¶ 62; DRPSAMF ¶ 62.  Supervisor Blouin had instructed her to deliver as much mail on her route as she could and to be back in eight hours, even though Dr. Campbell authorized Ms. Kirouac to work over eight hours.  PRDSMF ¶ 8; PSAMF ¶ 62; DRPSAMF ¶ 62.  In 2007, Ms. Kirouac had been disciplined for working beyond eight hours and had been instructed by Supervisor Blouin, both at her PDI and in the morning on June 12, 2008, to be "off the clock" on June 13, 2008 by eight hours.[60]  PSAMF ¶ 64; DRPSAMF ¶ 64.  Although Dr. Campbell's letter, which applied on June 13, 2008, released Ms. Kirouac to work without restrictions, Ms. Kirouac had submitted eight-hour work limitations in 2005 and 2007 and had long been on the Post Office's "Medical 8" list.  PSAMF ¶ 64; DRPSAMF ¶ 64.

---

removal.  DRPSAMF ¶ 62.  First, the Court determines that the facts in paragraph 62 are relevant to Ms. Kirouac's disability and pretext arguments.  *See* FED. R. EVID. 401; *Compl.* ¶¶ 401-11.  Next, viewing the facts in the light most favorable to Ms. Kirouac, which are supported by the record, the Court includes paragraph 62.  Further, the Court includes the Postmaster's qualification regarding Ms. Kirouac's lack of medical restrictions but does not include the Postmaster's qualification concerning the Arbitrator's decision because that fact is already included within the Statement of Facts.  *See* DSMF ¶ 15; PRDSMF ¶ 15; *Dr. Campbell Feb. 2008 Ltr. I.*

[60]     The Postmaster denied the statements in paragraph 64 because the Arbitrator found there was "just cause" to terminate Ms. Kirouac, Ms. Kirouac contradicts her panic and anxiety symptoms claim, there is no evidence of her "Medical 8" restrictions in the past, and because Dr. Campbell's letter confirms that Ms. Kirouac could work more than eight hours a day.  DRPSAMF ¶ 64.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court includes paragraph 64.

The morning of June 13, 2008, Ms. Kirouac did not request a Postal Service Form 3996 to indicate that she would need assistance on the street. DSMF ¶ 8; PRDSMF ¶ 8. Instead, Ms. Kirouac called the Post Office at 3:42 p.m., but could not reach anyone because the line was busy.[61] PRDSMF ¶ 8; PSAMF ¶ 62; DRPSAMF ¶ 62. When Ms. Kirouac returned to the Post Office, she brought the drive and dismount over to Supervisor Blouin's desk and informed Supervisor Blouin that was what she had left. PRDSMF ¶ 8; PSAMF ¶ 62; DRPSAMF ¶ 62. Supervisor Blouin turned around and asked what the drive and dismount was and after Ms. Kirouac explained that it was all she could deliver within eight hours, Supervisor Blouin asked Ms. Kirouac if she knew she could not finish her route that morning. PRDSMF ¶ 8. Ms. Kirouac said "no", that she did the best she could, and that she had tried to call the office but the phone was busy. PRDSMF ¶ 8. Ms. Kirouac then grabbed a cart and wheeled it out to her truck to unload. PRDSMF ¶ 8. It was not uncommon for a carrier to bring back mail and there are typically casuals or PTFs who go out to complete the route.[62] PSAMF ¶ 63; DRPSAMF ¶ 63. When Ms. Kirouac arrived back at the Post Office on June 13, 2008, there was at

---

[61]   According to her version of the June 13th incident, Ms. Kirouac states that she attempted to call the Post Office prior to returning to the office with undelivered mail. *Kirouac Statements* at 5. Viewing the facts in the light most favorable to her, the Court includes this statement.

[62]   The Postmaster interposed a qualified response to paragraph 63 because the Arbitrator found there was "just cause" to fire Ms. Kirouac, the statements in paragraph 63 are irrelevant to the Notice of Removal, and OIC Curtis had never witnessed an employee engage in conduct similar to Ms. Kirouac's conduct at the Post Office before. DRPSAMF ¶ 63. First, the Court includes the statements in paragraph 63 because they are relevant to Ms. Kirouac's pretext argument. *See* FED. R. EVID. 401; *Kirouac Decl.* ¶ 50. Second, the Court does not include the Postmaster's arbitration qualification because the Arbitrator's decision is already referenced in the Statement of Facts. *See* DSMF ¶ 15. Finally, the Court does not include OIC Curtis' comparison of Ms. Kirouac's conduct to the conduct of past employees as it is argumentative.

least one PTF at the office who was available to deliver the remaining mail. PSAMF ¶ 63; DRPSAMF ¶ 63.

As Ms. Kirouac was unloading her truck, Supervisor Blouin walked to the parking lot, dropped the undelivered mail into a tray in the back of Ms. Kirouac's truck, and instructed her to go out and finish delivering the mail.  PRDSMF ¶ 8; PSAMF ¶ 64; DRPSAMF ¶ 64.  Ms. Kirouac did not feel medically able to return to the street.  PSAMF ¶ 64; DRPSAMF ¶ 64.  She began to develop panic and anxiety symptoms when Supervisor Blouin approached her.  PSAMF ¶ 64; DRPSAMF ¶ 64. She had experienced an exacerbation of her panic and anxiety disorder symptoms since May 30, 2008.  PSAMF ¶ 64; DRPSAMF ¶ 64.  Ms. Kirouac told Supervisor Blouin, "You do not oversee my doctor's note."[63]  DSMF ¶ 8; PRDSMF ¶ 8. Supervisor Blouin said, "I am giving you a direct order to go out and finish delivering the mail."[64]  DSMF ¶ 8; PRDSMF ¶ 8.  Ms. Kirouac responded, stating, "You do not oversee my doctor's note."[65]  DSMF ¶ 8; PRDSMF ¶ 8.  Ms. Kirouac continued to unload her equipment into the cart as Supervisor Blouin walked back

---

[63]    In her statement regarding the events of June 13, 2008, Ms. Kirouac states that she told Supervisor Blouin that she did not oversee her doctor's note.  PRDSMF ¶ 8; *Kirouac Decl.* ¶¶ 51-55; *Kirouac Statements* at 5.  Although the language in the Notice of Removal is similar to the language in Ms. Kirouac's statement, the Court includes the language in Ms. Kirouac's statement as it must view the facts in her favor.  *See* DSMF ¶ 8.

[64]    The Postmaster quoted Supervisor Blouin as stating "I am giving you a direct order to finish your route" whereas Ms. Kirouac states Supervisor Blouin told her "I am giving you a direct order to go out and finish delivering the mail!"  DSMF ¶ 8; PRDSMF ¶ 8; *Kirouac Decl.* ¶¶ 51-55; *Kirouac Statements* at 5.  As the Court must view the facts in the light most favorable to the non-movant, the Court incorporates the language used by Ms. Kirouac.

[65]    In paragraph 8 the Postmaster claimed that Ms. Kirouac replied to Supervisor Blouin's order to finish her route "in a very loud and angry voice, [and stated] 'I will not do that, do you hear me.'" DSMF ¶ 8.  Ms. Kirouac's statement describes their conversation differently and states that she told Supervisor Blouin, "you do not oversee my doctor's note."  PRDSMF ¶ 8; *Kirouac Decl.* ¶¶ 53, 55; *Kirouac Statements* at 5.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court includes her version of her reply to Supervisor Blouin's direct order.

into the office.[66]  DSMF ¶ 8; PRDSMF ¶ 8.  Ms. Kirouac then went in the front of the truck to get her cell phone to call Marty Lang, the President of the Lewiston branch of the National Association of Letter Carriers (NALC), but he did not answer his phone.  PRDSMF ¶ 8.

When she got out of the truck, OIC Curtis was walking towards the truck and asked what was going on.  DSMF ¶ 8; PRDSMF ¶ 8.  Ms. Kirouac explained to OIC Curtis that she was an eight-hour carrier, that Supervisor Blouin gave her a direct order to go back out and finish delivering the mail, and that Ms. Kirouac would not do it because of her medical restrictions.  DSMF ¶ 8; PRDSMF ¶ 8.  OIC Curtis listened to what Ms. Kirouac said, responded with "uh huh" and "hmmm", and then walked into the Post Office.  PRDSMF ¶ 8.  When Ms. Kirouac insisted that she would not work more than eight hours that day, OIC Curtis contacted Nurse Dyer or Nurse Murphy, to confirm the most recent medical documentation for Ms. Kirouac and their office confirmed that her medical documentation had remained the same, including the authorization from Dr. Campbell for Ms. Kirouac to work more than eight hours per day.  DSMF ¶ 7; PRDSMF ¶ 7.  Nurse Murphy stated that "Cindy should be advised to provide updated medical documentation if anything has changed."[67]  PRDSMF ¶ 7.

---

[66]   Ms. Kirouac denied that she threw trays or any other equipment around in her vehicle during her conversation with Supervisor Blouin.  DSMF ¶ 8; PRDSMF ¶ 8; *Kirouac Decl*. ¶¶ 53. Viewing the facts in the light most favorable to Ms. Kirouac, the Court omits the portion of the Postmaster's Notice of Removal, which states that Ms. Kirouac threw trays and equipment around her vehicle.  *See* DSMF ¶ 8.

[67]   Ms. Kirouac interposed a qualified response to paragraph 7 clarifying that other Post Office employees had inquired into her medical restrictions on June 12, 2013 and that they were advised to tell Ms. Kirouac to supplement her records if anything had changed.  PRDSMF ¶ 7.  As Ms. Kirouac's qualifications are supported by the record, the Court includes them.  *See Curtis Dep. II* at 131:8-

Ms. Kirouac entered the Post Office and was approached by OIC Curtis who appeared confrontational and held out a letter from Nurse Dyer's office, which he said showed that Ms. Kirouac did not have any medical restrictions.  DSMF ¶ 8; PRDSMF ¶ 8.  Ms. Kirouac took the letter and said she would get him a copy as soon as she could.  PRDSMF ¶ 8.  She pushed her hamper down to her case and started to unload her equipment when OIC Curtis walked towards her and started saying something about the delivery dispute.  PRDSMF ¶ 8.  Ms. Kirouac then held her hands up palms out, and stated "I've had enough, I don't want to hear anymore."[68]  DSMF ¶ 8; PRDSMF ¶ 8.  OIC Curtis walked away and Ms. Kirouac proceeded to clean up.  PRDSMF ¶ 8.  When she was unable to find Nurse Dyer's fax, she entered OIC Curtis' office to request a copy and he replied, "What you are going to do right now is you['re] going to go home and we will call you when you can come back.  We are placing you on Emergency Placement, because I've had enough!" DSMF ¶ 8; PRDSMF ¶ 8.  Ms. Kirouac responded, "What are you talking about, I am a restricted eight hour carrier and I tried to call."  PRDSMF ¶ 8.  Ms. Kirouac stated, "Well, I'll be contacting my attorney" and OIC Curtis replied, "You do what you have to do."  PRDSMF ¶ 8.

---

133:25; *E-mail from Debbi Murphy to Michael P. Anderson & Wendy L. Blouin* (June 12, 2008 at 2:08 P.M.) (ECF No. 107-1) (*Murphy Email*).

[68]      The Postmaster cited the Notice of Removal, which states that as OIC Curtis approached Ms. Kirouac she "started waiving [her] arms and loudly said, 'Get away from me, I don't want to talk about it anymore, I've had it!'"  DSMF ¶ 8.  Ms. Kirouac's statement tells a slightly different story and because the Court must view the facts in the light most favorable to Ms. Kirouac, the Court includes her version of their interaction.  *Compare* PRDSMF ¶ 8; *with Kirouac Statements* at 5.

After leaving OIC Curtis' office, Ms. Kirouac went to her case to pack her satchel with all of her personal belongings.[69]   DSMF ¶ 8; PRDSMF ¶ 8.   Shortly thereafter, Ms. Kirouac saw Mr. Lang come into her area to grab a hamper and she asked him for union time because she was being put on leave.   DSMF ¶ 8; PRDSMF ¶ 8.   Supervisor Blouin told Mr. Lang that Ms. Kirouac was "off the clock" and Ms. Kirouac replied, "I'm not off the clock."   DSMF ¶ 8; PRDSMF ¶ 8.   Supervisor Blouin stated, "Marty, Cindy is off the clock" and when Ms. Kirouac denied that she was off the clock a second time, Supervisor Blouin asked her, "Well, why aren't you off the clock?"   DSMF ¶ 8; PRDSMF ¶ 8.   Ms. Kirouac responded, "Because I'm getting my stuff together."   DSMF ¶ 8; PRDSMF ¶ 8.   She proceeded to punch out and finish getting her personal belongings together at her case.   DSMF ¶ 8; PRDSMF ¶ 8.   Ms. Kirouac asked Mr. Lang how much longer she would have to wait to meet with him and he said ten minutes.[70]   DSMF ¶ 8; PRDSMF ¶ 8.   Ms. Kirouac waited at her case until Mr. Lang suggested that they meet in the parking lot, which they did.   DSMF ¶ 8; PRDSMF ¶ 8.

---

[69]   According to the Notice of Removal and the Postmaster's paragraph 8, Ms. Kirouac "refused to leave the workroom floor and stayed in the building for approximately fifteen to twenty additional minutes ignoring further instructions to leave."   DSMF ¶ 8.   In her statement, Ms. Kirouac acknowledges that she was told she was "off the clock" and explains that she remained in the building so she could speak with Marty Lang, the President of the local NALC branch.   PRDSMF ¶ 8; *Kirouac Statements* at 5.   Viewing the facts in the light most favorable to Ms. Kirouac, the Court includes these additional facts contained in Ms. Kirouac's statement.

[70]   In paragraph 8, pursuant to the Notice of Removal, the Postmaster asserted that Mr. Lang "told [Ms. Kirouac] that he would not speak with [her]."   DSMF ¶ 8.   Ms. Kirouac's description of the events following her discussion with OIC Curtis contradict the Postmaster's statement and establish that Mr. Lang was willing to speak with Ms. Kirouac in the office parking lot.   PRDSMF ¶ 8; *Kirouac Decl.* ¶ 54; *Kirouac Statements* at 5.   Viewing the facts in the light most favorable to Ms. Kirouac, the Court relies on Ms. Kirouac's version of the facts.

### 7.   Emergency Placement

On June 17, 2008, the Post Office placed Ms. Kirouac out of work in emergency placement in off-duty status without pay pursuant to a notice issued and signed by Supervisor Blouin, which stated:

> The reason for this action is that based upon information received on June 13, 2008, preliminary investigation indicates that you were so insubordinate and emotionally unstable and out of control to [Wendy Blouin] and the postmaster, that you presented a physical and safety threat to employees, managers, and the property of the U.S. Postal Service.[71]

PSAMF ¶¶ 66-67; DRPSAMF ¶¶ 66-67.   OIC Curtis placed Ms. Kirouac on emergency placement and when the union wanted the emergency placement rescinded, Supervisor Blouin denied their request and sent it to OIC Curtis.[72] PSAMF ¶ 74; DRPSAMF ¶ 74.   OIC Curtis completed and signed an affidavit on December 19, 2008 in which he stated that Ms. Kirouac was placed on emergency placement in off-duty status because:

> Violence, insubordination, we felt she was a danger to [her]self and others, we wanted to safeguard postal property and based on the supervisor's reaction (terrified) when she informed me of what happened.[73]

---

[71]    The Postmaster interposed a qualified response to paragraph 66 because the Notice of Emergency Placement and the Notice of Removal were issued on different dates and the Emergency Placement referenced a preliminary investigation rather than a termination of Ms. Kirouac's employment.  DRPSAMF ¶ 66.  As the Postmaster's qualifications are supported by the record, the Court includes them.  *See Emergency Placement in Off Duty Status Without Pay* (ECF No. 106-3); *Notice of Removal.*

[72]    The Postmaster interposed a qualified response because Supervisor Blouin's testimony involved Ms. Kirouac's emergency placement and OIC Curtis was the person who actually placed Ms. Kirouac on emergency placement.  DRPSAMF ¶ 74.  As the Postmaster's qualifications are supported by the record, the Court includes them.  *See Blouin Dep. II* at 270:2-271:23.

[73]    In paragraph 68 Ms. Kirouac stated that "[i]n an EEO Investigative Affidavit dated December 19, 2008, Supervisor Blouin stated that the reason she placed Ms. Kirouac in Emergency Placement in an Off-Duty Status was due to:

PSAMF ¶ 69; DRPSAMF ¶ 69.   In the same affidavit, OIC Curtis also stated, "[c]omplainant was not placed on emergency placement just for insubordination[,]" referencing his response noted above.   PSAMF ¶ 70; DRPSAMF ¶ 70.   OIC Curtis testified that he felt Ms. Kirouac was a danger to herself and to others.   PSAMF ¶ 71; DRPSAMF ¶ 71.   He further testified that he placed her on emergency placement due to "violence" and because he wanted to safeguard postal policy. PSAMF ¶ 71; DRPSAMF ¶ 71.

With respect to Ms. Kirouac's emergency placement, OIC Curtis also testified that he did not base his opinion that Ms. Kirouac was "a danger to herself and others" on the opinion of a physician.[74]   PSAMF ¶ 72; DRPSAMF ¶ 72.   He testified that he could not remember whether he recommended a fitness for duty for Ms. Kirouac.[75]   PSAMF ¶ 77; DRPSAMF ¶ 77.   OIC Curtis further testified that, what he did "know at the time was the incidents were sufficient to warrant emergency

---

Violence, insubordination, and danger to self and others, and the safeguard of Postal Property . . . Complainant was placed on emergency placement for more than insubordination.  It was her actions.  She was slamming things around, raising her voice and made an issue on the workroom floor.

PSAMF ¶ 68; DRPSAMF ¶ 68.  The Postmaster denied paragraph 68 because it is not supported by the record citation.  DRPSAMF ¶ 68.  The Court is also unable to find support for Ms. Kirouac's statement as exhibit thirty-three to Ms. Blouin's deposition does not include questions twenty and twenty-six.  *See Blouin Dep. II* Attach 5, *EEO Investigative Affidavit* (ECF No. 106-5).  Because paragraph 68 is not supported by the record citation, the Court omits it from the Statement of Facts. *See* D. ME. LOC. R. 56(f) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts").

[74]   The Postmaster interposed a qualified response clarifying that OIC Curtis' statement related to the Notice of Emergency Placement and not the Notice of Removal.  DRPSAMF ¶ 72.  As the record supports the Postmaster's qualification, the Court includes it.

[75]   The Postmaster interposed a qualified response to paragraph 77 clarifying that OIC Curtis could not remember whether he recommended a fitness for duty for Ms. Kirouac and that his testimony referenced a "fitness for duty" not a "psychological fitness-for-duty."  DRPSAMF ¶ 77. Because the Postmaster's qualifications are supported by the record, the Court includes them.  *See Curtis Dep. II* at 157:7-15.

placement" and that "[a]fter all the postal shootings and thing[s] that have happened throughout the years, you know, we have to be very extra careful when it comes to anything like this to protect the interest of the post office."[76]  PSAMF ¶ 78; DRPSAMF ¶ 78.  He also testified that he felt that because Ms. Kirouac seemed emotionally unstable and out of control, that he needed to protect the Post Office, adding "I don't know what she could have done or would have done.  Maybe nothing.  Maybe something.  It's not my determination to make.  I can't take that risk."  PSAMF ¶ 78; DRPSAMF ¶ 78.

In a statement prepared by Supervisor Blouin concerning the events of June 13, 2008, she wrote:

> Due to Ms. Kirouac's mental state of mind which reflected in her physical and verbal actions it is management['s] responsibility to ensure a safe working environment for all employees.  I, Wendy Blouin am Ms. Kirouac's supervisor and I personally felt threaten[ed] by Ms. Kirouac's actions and aggressive tones.  Ms. Kirouac conducted herself in an unprofessional manner which resulted in other employees to feel threatened and uncomfortable.  Ms. Kirouac was throwing and abusing Postal property.  After being placed on Emergency Placement by the OIC . . . .
>
> Ms. Kirouac's long history of insubordination, immaturity and emotional issues makes me believe that she will never be an asset to this office or any other.  Her instability makes her a constant safety and security risk.[77]

PSAMF ¶ 73; DRPSAMF ¶ 73.  Supervisor Blouin testified at her deposition that she believed Ms. Kirouac's emergency placement out of the Post Office was

---

[76]     The Postmaster interposed a qualified response to paragraph 78 because the subject matter was "why [Cindy] was placed on emergency off-duty status."  DRPSAMF ¶ 78.  As the Postmaster's qualification is supported by the record, the Court includes it.  *See Curtis Dep. II* at 155:4-157:6.

[77]     The Postmaster interposed a qualified response because Ms. Kirouac did not specify that Supervisor Blouin's statement related to the Emergency Placement rather than the Notice of Removal.  DRPSAMF ¶ 73.  Because the record supports the Postmaster's qualification, the Court includes it.

warranted to ensure a safe working environment for Post Office employees, that her "mental state of mind" was a threat to a safe working environment, and that Ms. Kirouac's "instability" made her a "constant safety and security risk." PSAMF ¶ 74; DRPSAMF ¶ 74. Supervisor Blouin also testified that she viewed Ms. Kirouac to be a safety threat to the employees of the Post Office on June 13, 2008.[78] PSAMF ¶ 75; DRPSAMF ¶ 75. Regarding Ms. Kirouac's emergency placement, Supervisor Blouin testified that she did not order a psychological fitness for duty and did not seek a medical opinion concerning whether Ms. Kirouac posed a safety threat to employees within the Post Office work environment, stating, "No, but I felt that my safety was in effect. So that's what it is."[79] PSAMF ¶ 76; DRPSAMF ¶ 76.

### 8.   Notice of Removal

On June 24, 2008, the Post Office issued Ms. Kirouac a Notice of Removal stemming from the alleged occurrences on June 13, 2008. PSAMF ¶ 66; DRPSAMF ¶ 66. Supervisor Blouin testified that she was the agency representative who made the decision to issue Ms. Kirouac the Notice of Removal (termination) from her Post Office employment due to the conduct she allegedly engaged in on June 13, 2008 and that OIC Curtis concurred with her decision. PSAMF ¶ 75; DRPSAMF ¶ 75. OIC Curtis testified that he and Supervisor Blouin were the decision makers

---

[78]   The Postmaster interposed a qualified response to clarify that Supervisor Blouin was initially referencing the decision to place Ms. Kirouac on emergency placement and also to note that OIC Curtis concurred with Supervisor Blouin's decision to issue the Notice of Removal. DRPSAMF ¶ 75. Because the Postmaster's qualifications are supported by the record, the Court includes the Postmaster's qualifications.

[79]   The Postmaster interposed a qualified response because paragraph 76 relates to the decision to place Ms. Kirouac on emergency placement and because OIC Curtis made that decision. DRPSAMF ¶ 76. As the Court has already included a qualification stating that OIC Curtis made the decision to put Ms. Kirouac on emergency placement, the Court declines to repeat that fact; however, it notes that Supervisor Blouin's testimony related to emergency placement.

concerning Ms. Kirouac's removal and that during his discussion with Supervisor Blouin about issuing Ms. Kirouac a removal notice, Supervisor Blouin "talked about the confrontations with [Cindy] through the years and stated that 'she was scared of [Ms. Kirouac].'"[80]   PSAMF ¶ 79; DRPSAMF ¶ 79.   According to the Notice of Removal, Supervisor Blouin considered Ms. Kirouac's actions "extremely serious" and to violate the following Postal Service rules and regulations:

**The Employee and Labor Relations Manual (ELM):**

**Section 665.16 Behavior and Personal Habits:**   Employees are expected to conduct themselves during and outside of working hours in a manner that reflects favorably upon the Postal Service.   Although it is not the policy of the Postal Service to interfere with the private lives of its employees, it does require that postal employees be honest, reliable, trustworthy, courteous, and of good character and reputation.

**Section 665.15 Protests:**   Employees must obey the instructions of their supervisors.   If the employee has reason to question the propriety of a supervisor's order, the individual will nevertheless carry out the order and immediately file a protest in writing to the official in charge of the installation, or appeal through official channels.

**The M-41 Handbook, City Delivery Carrier Duties and Responsibilities:**

**Section 112.21:**   Obey the instructions of your manager.

**Section 131.33:**   Unless otherwise instructed by a unit manager, deliver all mail distributed to your route prior to the leaving time for that trip and complete delivery within scheduled time.   It is your responsibility to inform management when this cannot be done.[81]

---

[80]     The Postmaster admitted the first statement in paragraph 79 but interposed a qualified response to the second statement because Supervisor Blouin also discussed "her confrontations with [Ms. Kirouac] throughout the years" with OIC Curtis.   DRPSAMF ¶ 79.   Because the Postmaster's qualification is supported by the record, the Court includes it.   *See Curtis Dep. II* at 164:20-165:3.

[81]     As noted, Ms. Kirouac denied paragraph 8 because "[t]he explanation[s] offered in the Notice of Removal for Ms. Kirouac's termination are false and pretextual explanations for her removal."   PRDSMF ¶ 8.   To support her denial Ms. Kirouac cites her sworn affidavit and an incorporated statement of the events, which took place on June 13, 2008.   PRDSMF ¶ 8; *see Kirouac Decl.* ¶¶ 51-54; *Kirouac Statements* at 5.   She did not address the Post Office policies listed in the Notice of

DSMF ¶ 8; PRDSMF ¶ 8.  In the Notice, Ms. Kirouac was also advised that:

> [T]he following elements of your past record have been considered in deciding to take this action:
>
> 1) Letter of Warning dated 2/12/2007 on a charge of Failure to Follow Instructions.
>
> 2) 7-day suspension dated 6/19/2007 on a charge of Failure to Follow Instructions.
>
> 3) 14-day suspension dated 6/4/2008 on a charge of Failure to Properly Perform Your Duties.

DSMF ¶ 8; PRDSMF ¶ 8.

### 9.   Arbitration

In accordance with the collective bargaining agreement, Ms. Kirouac and her union, NALC, challenged the Notice of Removal which culminated in a two-day arbitration on December 18, 2008 and January 26, 2009, before a neutral arbitrator. DSMF ¶ 9; PRDSMF ¶ 9.  Ms. Kirouac was represented by Renee Overlock, a letter carrier and officer of NALC's Branch 391, in accordance with the national collective bargaining agreement between the Postal Service and NALC.[82]   DSMF ¶ 10; PRDSMF ¶ 10.

---

Removal that she allegedly violated or the other "elements of her past record" which were considered by Post Office management when deciding to terminate her employment.  *See* PRDSMF ¶ 8; *Kirouac Decl.* ¶¶ 51-54.  Thus, the Court includes the remaining portions of the Postmaster's paragraph 8.

[82]   Ms. Kirouac denied paragraph 10 because she did not consider Ms. Overlock to be "an experienced arbitration advocate" especially where she had only served as an arbitration advocate one time prior to Ms. Kirouac's arbitration proceedings.  PRDSMF ¶ 10; *Kirouac Decl.* ¶ 59.  Because Ms. Dougherty's declaration does not cite any independent document confirming Ms. Overlock's qualifications, viewing the facts in the light most favorable to Ms. Kirouac the Court omits "experienced Arbitration Advocate" from paragraph 10.  *See Decl. of Theresa Dougherty* (ECF No. 87-1) (*Dougherty Decl.*).  Instead, the Court incorporates Ms. Overlock's name and her position with the Post Office in paragraph 10.

At the arbitration, both sides were allowed to call witnesses and engage in direct and cross examination; a correct list of witnesses called by each side appears on the first page of the arbitration decision.  DSMF ¶ 11; PRDSMF ¶ 11.  Both sides were allowed to introduce exhibits in support of their respective positions but the exhibits were limited to records that had been included in the NALC union grievance file, which excluded some records relevant to Ms. Kirouac's statutory claims and totaled eighty-five pages from NALC.[83]  DSMF ¶ 12; PRDSMF ¶ 12; PSAMF ¶ 84; DRPSAMF ¶ 84.  The documents in this litigation number approximately 22,000 to 30,000, which likely includes some duplicate documents.  PSAMF ¶ 84; DRPSAMF ¶ 84.

The arbitration decision in Ms. Kirouac's case was issued on March 18, 2009.  DSMF ¶ 13; PRDSMF ¶ 13.  The scope of the Arbitrator's decision included assessing whether the collective bargaining agreement between the Postal Service and NALC was violated, and more specifically to determine the validity of the Postal Service's decision to issue the Notice of Emergency Placement and the Notice of Removal by applying Postal Service and Collective Bargaining Rules to the facts

---

[83]   Ms. Kirouac interposed a qualified response to paragraph 12 because the exhibits were limited to records that had been included in the NALC union grievance file rather than any exhibits that might pertain to Ms. Kirouac's statutory claims.  PRDSMF ¶ 12.  Viewing the facts in the light most favorable to the non-movant, the Court incorporates Ms. Kirouac's qualification.  Given the Court's decision to include Ms. Kirouac's qualification, the Court does not accept the Postmaster's denial of the first statement in Ms. Kirouac's paragraph 84, especially since Ms. Kirouac's statement is supported by her sworn declaration and the Court does not view Ms. Kirouac's statement as an attempt to re-litigate the arbitration.  *See Kirouac Decl.* ¶¶ 60-61.  Also, the other sources of information offered to the Arbitrator during the arbitration cited by the Postmaster, such as live testimony subject to cross-examination, are already referenced in this section.  *See* DSMF ¶ 11; PRDSMF ¶ 11.  Further, the Court includes Ms. Kirouac's second statement in paragraph 84 because it is supported by Ms. Hansen's declaration, but qualifies the statement to note that some of the documents may be double-counted and may be duplicates.  *See Hansen Decl.* ¶ 3.

as presented through testimony and evidence.[84]   PSAMF ¶ 80; DRPSAMF ¶ 80.

The Arbitrator confirmed the scope of his decision, when he stated:

> I share Management's conclusion that the Grievant's conduct after being instructed to complete her route demonstrated a complete disregard for the manager/employee relationship, and her refusal to follow instructions.   The Union obliquely concedes that this conduct normally would be considered insubordinate.   A great deal of time was spent at the second hearing on the linchpin of the NALC's defense, with Ms. Kirouac discussing her 2006 EEO complaint that she had filed due to her disabilities, which [was] accepted by OWCP . . . This included perceived harassment by former Supervisor Mike Anderson and Postmaster St. Andre.   In my considered judgment, this is not germane to the subject proceeding.   Instead, no nexus has been established to the EP or the NOR before me.[85]

PSAMF ¶¶ 81, 85; DRPSAMF ¶¶ 81, 85.

Based on the evidence presented during the arbitration, and applying the pertinent Postal Service and collective bargaining rules as the bargaining agreement was not violated, the Arbitrator upheld the Notice of Removal and concluded that there was "just cause" for Ms. Kirouac's employment termination; however, he did not determine, and did not have the authority to decide, whether the Postal Service violated Ms. Kirouac's rights under Title VII or the

---

[84]   The Postmaster interposed a qualified response to paragraph 80 to give a more detailed description of the scope of the arbitration.   DRPSAMF ¶ 80.   Because the Postmaster's qualification is supported by the record, the Court includes it.   *See United States Postal Serv. v. Nat'l Assoc. of Letter Carriers*, B06N-4B-D 08279756 & B06N-4B-D 08281343 Reg. Arb. Panel 1, 1-2 (2009) (Pecklers, Arb.) (ECF No. 117-1 & 117-2) (*Arb. Decision*).

[85]   The Postmaster interposed a qualified response to paragraphs 81 and 85, which contain the same statement of fact, because he argues that the Court should consider the entire paragraph of the quoted passage from the Arbitrator's decision and because the first phrase of Ms. Kirouac's statement is based on impermissible lay opinion.   DRPSAMF ¶¶ 81, 85.   As the Postmaster's quoted response is supported by the record, the Court includes the text for the entire paragraph on page 38 of the arbitration decision.   *See Arb. Decision* at 38.   Also, the Court omits the first part of Ms. Kirouac's statement—"The Arbitrator . . . acknowledged the Plaintiffs disabilities and subsequently disregarded the same"—because the paragraph's text does not support that he disregarded her disabilities but points out that he did not find her previous EEO disability claim relevant to the arbitration dispute.   *See id.*

Rehabilitation Act.[86]   DSMF ¶ 15; PRDSMF ¶ 15; PSAMF ¶ 81; DRPSAMF ¶ 81. The collective bargaining agreement between the Postal Service and NALC does not waive the rights of union members to file statutory discrimination and retaliation claims under Title VII or the Rehabilitation Act, or any other federal employment statute.  PSAMF ¶ 83; DRPSAMF ¶ 83.

Ms. Kirouac's employment termination became final and official, after the arbitration, when the Arbitrator denied the NALC's grievances regarding Ms. Kirouac's removal and upheld her termination as stated in the arbitration decision.[87]   DSMF ¶ 16; PRDSMF ¶ 16.

---

[86]   Ms. Kirouac interposed a qualified response to paragraph 15 asserting that (1) the collective bargaining agreement was not violated, (2) the arbitrator did not determine whether the Postal Service violated Title VII or the Rehabilitation Act, and (3) the arbitrator did not "make a determination concerning 'just cause' in any meaning of the term apart from the union contract." PRDSMF ¶ 15.  Viewing the facts in the light most favorable to Ms. Kirouac, the Court incorporates Ms. Kirouac's first and second qualifications but omits her third qualification because it is not supported by the record citation.  *See Arb. Decision* at 36.

In paragraph 81, Ms. Kirouac states that "The arbitrator did not decide, and had no authority to decide, [her] statutory discrimination and relations claims under Title VII of the Civil Rights Act of 1964 . . . and the Rehabilitation Act of 1973 . . . ."  PSAMF ¶ 81.  The Postmaster interposed a qualified response because the "scope" of the arbitration was to assess "the validity of the Emergency Placement and the Notice of Removal by applying Postal Service and Collective Bargaining Rules to the facts."  DRPSAMF ¶ 81.  Because the Postmaster's qualification is already incorporated into this section by surrounding sentences, the Court does not qualify paragraph 81.

[87]   Ms. Kirouac interposed a qualified response stating that "[t]he arbitration decision denied the union grievances that were filed concerning the plaintiff's removal." PRDSMF ¶ 16.  Viewing the facts in Ms. Kirouac's favor, the Court incorporates her qualification.

In paragraph 17, the Postmaster stated, "During Curtis's tenure as the Officer in Charge, no other Lewiston Post Office employee engaged in conduct that was comparable to Cindy Kirouac's conduct as described in the Notice of Removal, some of which Curtis personally witnessed and experienced to the extent it was directed at him."  DSMF ¶ 17.  In paragraph 18, the Postmaster also stated, "[i]ndeed, in Curtis's 19 years as a member of the Postal Service management, he has never had an employee engage in conduct similar to that of Cindy Kirouac, as described in the Notice of Removal."  DSMF ¶ 18.  Ms. Kirouac denied both paragraphs because OIC Curtis' version of the events that occurred on June 13, 2008 in the Notice of Removal "is false and distorted[,] [s]he did not engage in the alleged conduct."  PRDSMF ¶¶ 17-18.  As the Court must view the facts in the light most favorable to Ms. Kirouac and declines to completely adopt the Notice of Removal's account of the events on June 13, 2008, the Court omits the Postmaster's statements in paragraphs 17 and 18.

## II.   THE PARTIES' POSITIONS

### A.   The Postmaster's Motion

The Postmaster argues that the Court should enter summary judgment on Ms. Kirouac's Rehabilitation Act claim because (1) she cannot establish a prima facie case and, even if she could, (2) the arbitration decision confirms that her employment termination was based on legitimate, non-discriminatory and non-pretextual reasons.  *Def.'s Mot.* at 1.   Contrary to Ms. Kirouac's claim, the Postmaster asserts that Ms. Kirouac was fired for insubordination and not "due to a belief that she presented a safety risk."  *Id.* at 6.  Accordingly, he argues that "the allegations do not fit the facts."  *Id.*  Even if Ms. Kirouac's Rehabilitation Act claim could be construed to fit the facts, the Postmaster contends that her claim cannot satisfy the first and third elements of a prima facie Rehabilitation Act discrimination claim.  *Id.* at 7.  He argues that during the period of time relevant to her claim, Ms. Kirouac was not disabled or fired because of a disability as she was released to work without medical restrictions by her doctor and was fired for insubordination.  *Id.* at 7-9.

If the Court finds that Ms. Kirouac satisfies the prima facie test, the Postmaster insists that Ms. Kirouac was fired for legitimate, non-discriminatory reasons that were not pretextual.  *Id.* at 9-10.  The Postmaster compares the facts of this case to *Joson v. Permanente Medical Group*, No. C 11-01018 JW, 2012 U.S. Dist. LEXIS 34376, at *19 (N.D. Cal. Mar. 1, 2012), where the district court found that the defendant employer fired the plaintiff for a legitimate, non-discriminatory

reason as her conduct violated the defendant's blood lab policy and a neutral arbitrator agreed that the employee's conduct was grossly negligent. *Id.* at 12-13. The Postmaster argues that the facts here call for a similar finding because Ms. Kirouac was fired for insubordination, was not disabled at the time of her offense, and a neutral arbitrator determined that there was "just cause" for her employment termination. *Id.* at 13-14. Moreover, the Postmaster argues that Ms. Kirouac cannot prove causation, namely that her alleged disabilities were the "but for" cause of her termination. *Id.* at 9-10.

### B.    Ms. Kirouac's Opposition

In opposition, Ms. Kirouac states that she is suing the Postmaster for employment discrimination under the Rehabilitation Act because the Post Office premised her employment termination on a belief that she presented a safety risk to other persons in the Post Office and because the decision to fire her was not based on objective medical information as required by the Act. *Pl.'s Opp'n* at 1-2, 16. First, Ms. Kirouac asserts that she can satisfy the elements of a prima facie Rehabilitation Act discrimination case because she was disabled at the time of her termination and the offense that allegedly triggered her termination. *Id.* at 9-10. She insists that her medical conditions of "[m]ajor depression, panic and anxiety disorders, PTSD and ADD are recognized as mental impairments that can constitute disabilities under the Rehabilitation Act." *Id.* at 11-12. Further, given the documented history of Ms. Kirouac's medical disabilities, there is sufficient

evidence showing that these disabilities substantially limited several major life activities. *Id.* at 14-15.

Second, Ms. Kirouac asserts that the Emergency Placement Notice and admissions by Post Office representatives confirm that they placed her out of work because she was "'emotionally unstable'" and presented "'a physical and safety threat to employees, managers and the property of the U.S. Postal Service.'" *Id.* at 16-18. "The repeat sworn testimony and statements of the defendant decision makers on this issue directly contradict the position the defendant is now asserting and as such, the motion itself generates a clear material dispute concerning the motivation and basis for the plaintiff's removal from her employment as a USPS letter carrier." *Id.* at 22. Further, even if management truly regarded her as a safety risk, Ms. Kirouac contends that the Postmaster cannot assert a business necessity defense because the Post Office did not base its decision that she was a safety risk on objective medical evidence. *Id.* at 20-22.

Third, Ms. Kirouac argues that the evidence supporting the Postmaster's legitimate, non-discriminatory reason is "grossly inadequate." *Id.* at 23. She insists that there is abundant evidence of her Post Office supervisors' discriminatory motive for firing her, which includes: (1) the long history of harassment against Ms. Kirouac at the Post Office; (2) evidence of Postmaster St. Andre's animus towards her after she filed her EEO complaint; (3) the nature of the discipline imposed on her; (4) the statements of Ms. Kirouac's coworkers confirming her harassment; (5) the medical evidence confirming her medical conditions; (6) her successful job

performance when OIC Curtis changed his management style; (7) the harassment following the EEO investigatory interviews; (8) the false characterization of her conduct on June 13, 2008; (9) her status as the only employee to file an EEO claim against Postmaster St. Andre; and (10) her supervisors' admissions concerning their discriminatory motives behind her termination. *Id.* at 23-24. Accordingly, Ms. Kirouac argues, there is enough evidence to satisfy the "but for" causation standard. *Id.* at 25.

Finally, Ms. Kirouac contends that the arbitration decision should not be given preclusive effect by the Court because this case involves a claim of employment discrimination and Ms. Kirouac's statutory rights. *Id.* at 25-26. She points out, "[w]hile the arbitration decision may be admitted as evidence and may be entitled to weight, the determination of the weight is one for the fact finder rather than a basis for summary judgment." *Id.* at 28-29. Moreover, she argues that "the arbitration was a grossly deficient process" because she was represented by a union representative with little experience. *Id.* at 29.

### C.   The Postmaster's Reply

In response, the Postmaster argues that Ms. Kirouac fails to demonstrate that the reasons for her termination were pretextual and a cover for discrimination. *Def.'s Reply* at 4. He places importance on Ms. Kirouac's "false insistence, on June 13, 2008, that she was a 'Medical 8'" and her failure to provide the Court with evidence that she was restricted from working over eight hours per day. *Id.* at 4-5. Accordingly, the Postmaster points to Dr. Campbell's February 26, 2008 letter,

which released Ms. Kirouac to work without restrictions, and asserts that even if the Post Office had accepted his first version with the restrictions, the letter still did not restrict the number of hours Ms. Kirouac could work. *Id.* at 5. Ultimately, the Postmaster argues, Ms. Kirouac was fired for insubordination on June 13, 2008 because she refused to deliver mail, acted insubordinate to her supervisor, raised her voice, and threw around Postal Service property. *Id.*

The Postmaster also criticizes Ms. Kirouac's inclusion of "red herring[s]" as "[Postmaster] St. Andre and [Supervisor] Anderson had nothing to do with the events of June 13, 2008." *Id.* at 5-6. Finally, the Postmaster argues that Ms. Kirouac conflates the Notice of Emergency Placement with the Notice of Removal and places too much importance on Post Office management's concerns about her safety and potential to harm other workers, which was the subject of the Notice of Emergency Placement and not the Notice of Removal. *Id.* at 6. Regardless, the Postmaster contends that "[b]y upholding *both* Notices, the Arbitrator demonstrated that the Postal Service['s] actions were legitimate and non-discriminatory." *Id.* (emphasis in the Postmaster's Reply).

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain*

*Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).   An issue is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy*, 56 F.3d at 315).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).   In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).   However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

### B.   Count V:  Disability Discrimination under the Rehabilitation Act

The Rehabilitation Act prohibits the Postal Service from discriminating against its employees on the basis of a disability. *See* 29 U.S.C. § 794(a).   Given

that Ms. Kirouac has not presented any direct evidence of discrimination by the Post Office, the Court must test the validity of her disability discrimination claim under the familiar burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[88]  *See Rios-Jimenez v. Sec'y of Veterans Affairs*, 520 F.3d 31, 40-41 (1st Cir. 2008).  First, in a disability discrimination action under the Rehabilitation Act, a plaintiff must prove by a preponderance that: (1) "she was disabled within the meaning of the statute;" (2) "she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation;" and (3) "the employer took adverse action against her because of the disability." *Id.*; *see McDonnell Douglas Corp.*, 411 U.S. at 802.

If the plaintiff is able to make out the three prima facie elements, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision and to support that reason with credible evidence.  *Rios-Jimenez*, 520 F.3d at 41; *see McDonnell Douglas Corp.*, 411 U.S. at 802.  If the defendant is able to provide such a reason, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is simply pretext designed to cover up discrimination against the plaintiff.  *Rios-Jimenez*, 520 F.3d at 41; *see McDonnell Douglas Corp.*, 411 U.S. at 803-05.  Ultimately, the burden of proving unlawful discrimination rests with the plaintiff.  *Rios-Jimenez*, 520 F.3d at 41 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

---

[88]     Although *McDonnell Douglas Corp.* involved a claim under Title VII of the Civil Rights Act of 1964, the same analytic framework applies to claims under the ADA and the Rehabilitation Act.  *See D.B. v. Esposito,* 675 F.3d 26, 41 (1st Cir. 2012); *Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 11 n.1 (1st Cir. 2004).

### 1.    Ms. Kirouac's Prima Facie Case

### a.    Disability

Section 794(a) of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity . . . conducted by . . . the United States Postal Service." 29 U.S.C. § 794(a). According to section 705(20), a person is disabled if she (1) "has a physical or mental impairment which substantially limits one or more of such person's major life activities", (2) "has a record of such an impairment", or (3) "is regarded as having such an impairment." *Id.* § 705(20)(B); *see McDonough v. Donahoe*, 673 F.3d 41, 46-47 (1st Cir. 2012). Here, Ms. Kirouac's discrimination claim rests on the Rehabilitation Act's first two definitions of disability as (1) she has mental impairments that affect multiple major life activities including "her ability to sleep, concentrate, remember, engage in self-care, and interact with others" and (2) she has a record of mental impairments. *Pl.'s Opp'n* at 12, 15.

Whether a particular plaintiff is disabled under the Rehabilitation Act is a question that must be decided on a case-by-case basis according to a three part analysis, which requires the plaintiff to show: (1) she has an impairment; (2) that the impairment affects a major life activity; and (3) that the impairment substantially limits the major life activity. *Id.* at 46-47; *Rolland v. Potter*, 492 F.3d 45, 48 (1st Cir. 2007). The terms "substantially limits" and "major life activity"

have been narrowly interpreted in the First Circuit to create a demanding standard whereby "an individual must have a permanent or long term impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *McDonough,* 673 F.3d at 47 (quoting *Rolland,* 492 F.3d at 47) (internal quotation marks omitted).

First, the Court concludes that Ms. Kirouac had qualifying mental impairments when the Post Office terminated her employment. The record contains documents from Ms. Kirouac's treating physicians confirming that she has major depression, panic disorder, an anxiety disorder, ADD, and PTSD. PSAMF ¶ 1; DRPSAMF ¶ 1. Courts in the First Circuit have held that the majority of her medical conditions—specifically, depression, panic disorder, anxiety disorder, and PTSD—may constitute impairments under the Act. *See Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 20 (1st Cir. 2004) (confirming that depression is a qualifying mental impairment); *Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003) (assuming, without deciding, that the plaintiff's panic attacks and anxiety disorder constituted qualifying disabilities); *O'Donnell v. Gonzales*, No. 04-40190-FDS, 2007 U.S. Dist. LEXIS 27149, at *21 (D. Mass. Apr. 2, 2007) (concluding that the plaintiff had a qualifying disability because she suffered from PTSD and depression). The argument that Ms. Kirouac had qualifying mental impairments is strengthened when her mental disorders are viewed in the aggregate. *See Tebo v. Potter*, 345 F. Supp. 2d 61, 66 (D. Mass. 2004) (concluding that the plaintiff's "other medical problems, such as his anxiety and panic disorder, further support his claim

that his mental illness was severe enough to qualify as a mental impairment under the Rehabilitation Act").

There is also ample evidence in the record that Ms. Kirouac had mental impairments during the time period relevant to Count V.[89]  Beyond her medical diagnoses, the record also establishes that Ms. Kirouac's mental disorders became symptomatic around 2000, she sought treatment from various medical professionals from 2000 to 2012, was prescribed a series of medications to manage her mental disorders, and was placed on numerous medical leaves from work during 2005 to 2008.   PSAMF ¶¶ 1-7, 18; DRPSAMF ¶¶ 1-7, 18.   Furthermore, Ms. Kirouac's history with the Postal Service establishes sufficient evidence from which a jury could conclude that she was an individual with a record of a disability under 29 C.F.R. § 1630.2(k), which captures an individual who "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."

The Postmaster strenuously argues that Dr. Campbell released Ms. Kirouac to work without restrictions and therefore, she cannot be considered to have been impaired.  *Def.'s Mot.* at 7-9; *Def.'s Reply* at 4-5 ("[A]ll the evidence demonstrates that Dr. Campbell released Kirouac without restriction by letter dated February 26, 2008").  Although the Postmaster may be able to convince a jury that Ms. Kirouac

---

[89]     Ultimately, the "relevant time period" applicable to this case is an issue of fact for the jury to decide subject to the statute of limitations.  The Postmaster appears to argue that the time period relevant to his motion begins with Ms. Kirouac's March 2008 return to work and ends with the issuance of her Notice of Removal.  *See Def.'s Reply* at 5-6.  Yet, given the Court's obligation to view the facts in Ms. Kirouac's favor at this stage in the litigation, the Court concludes that the relevant time period for the Postmaster's motion likely spans from 2005, when Ms. Kirouac filed her first discrimination claim against Postmaster St. Andre, until her termination on June 24, 2008.  *See* PSAMF ¶¶ 19, 66; DRPSAMF ¶¶ 19, 66.

had no restrictions, the question here is whether Ms. Kirouac has generated a genuine issue of material fact about whether she was so restricted. Here, the Court concludes that she has generated such an issue.

Viewed in the light most favorable to Ms. Kirouac, Dr. Campbell's February 26, 2008 letter was not a clean bill of health; the letter is more aspirational than directive, stating the doctor's hope that Ms. Kirouac would be able to return to work without any restrictions. *See Dr. Campbell Feb. 2008 Ltr. I* (stating "I feel Cindy is emotionally able to return to work"). First, Dr. Campbell noted that he had been treating Ms. Kirouac for ADD, major depression, anxiety and pain disorder, and PTSD. *Id.* He gave no indication that Ms. Kirouac had fully recovered from these ongoing psychiatric conditions. *Id.*

Second, Dr. Campbell's second version of the medical release letter released Ms. Kirouac to return to work on the condition that the Postal Service would comply with the provisions set down in section 58 of the Resolution of EEO Claim. *See Dr. Campbell Feb. 2008 Ltr. II* at 1. Those conditions included not singling out Ms. Kirouac for discipline, the managers not yelling or raising their voices during their interactions with her, having a union steward present during all performance counseling and disciplinary discussions with her, and compliance with all federal non-retaliation and harassment statutes and regulations. *Id.* at 2. Except for the last condition, these restrictions are not common to all employees.

Although Dr. Campbell stated in his February 26, 2008 letter that Ms. Kirouac's mental disorders could be managed with medication and that he believed

59

she was emotionally able to return to work, the permanency of her mental disorders and her history of periodic medical leaves from work support a reasonable conclusion that she had mental impairments when she was fired. *See* DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶¶ 2, 18; DRPSAMF ¶¶ 2, 18. Ms. Kirouac's complaints of continuing panic attacks after returning to work in March 2008, including an attack on June 13, 2008, further support that conclusion. PSAMF ¶¶ 55, 64; DRPSAMF ¶¶ 55, 64. *See Calero-Cerezo*, 355 F.3d at 21 (finding that evidence of the plaintiff's diagnosis, her medications, her numerous medical leaves, and partial hospitalization was sufficient to show that she had a qualifying disability). Thus, despite the Postmaster's insistence that Dr. Campbell's February 26, 2008 letter undermines Ms. Kirouac's claim that she was disabled, the Court concludes that his letter raises a genuine issue of material fact as to whether she was in fact released to return to work without restriction.

In addition, Ms. Kirouac has established that her mental impairments affect six major life activities. A "'major life activity' is an activity of central importance to people's daily lives." *Calero-Cerezo*, 355 F.3d at 21 (quoting *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 197 (2002)). Ms. Kirouac states that her mental disorders affect her ability to think, sleep, concentrate, remember, engage in self-care, and interact with others. *Pl.'s Opp'n* at 12. Further, "[w]hen symptomatic, her panic disorder produced attacks that resulted in a complete inability to function with feelings of being smothered, difficulty breathing, tightness in her mouth and neck, intense fear, a pounding heart, trembling, shaking, dizziness, numbness, and

nausea." *Id.*  As noted in *Calero-Cerezo*, the First Circuit has found that sleeping, interacting with others, learning, thinking, and concentrating are all major life activities.  355 F.3d at 21; *see Criado v. IBM Corp.*, 145 F.3d 437, 422-43 (1st Cir. 1998) (sleeping and relating to others); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 155 (1st Cir. 1998) (learning); *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30, 33 n.4 (1st Cir. 2001) (thinking and concentrating).

Finally, the Court concludes that Ms. Kirouac's mental disorders substantially limited some of her major life activities.  Although "substantially limited" is not explicitly defined by the Rehabilitation Act, in *Sutton v. United Air Lines*, 527 U.S. 471 (1999), the Supreme Court stated that "substantially limits" suggests "'considerable' or 'specified to a large degree.'"  *Id.* at 491; *see Calero-Cerezo*, 355 F.3d at 21.  Yet, the phrase does not require Ms. Kirouac to show she was completely incapable of engaging in major life activities because "[a]n impairment can substantially limit a major life activity, even though the plaintiff is still able to engage in the activity to some extent."  *Calero-Cerezo*, 355 F.3d at 22 (citing *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 22 (1st Cir. 2002)).

The record contains sufficient evidence to establish that Ms. Kirouac's mental disorders considerably limited her ability to concentrate, think, sleep, remember, engage in self-care, and interact with others.[90]  From 2005 until 2008, Ms. Kirouac was placed on periodic medical leaves from work due to her mental disorders and

---

[90]     Notably, Ms. Kirouac only needs to show that one major life activity is significantly limited by her impairment; however, for the sake of completeness, the Court addresses all six major life activities.  *See O'Donnell v. Gonzalez*, No. 04-40190-FDS, 2007 U.S. Dist. LEXIS 27149, at *22 n.11 (D. Mass. Apr. 2, 2012).

their impact on her ability to work.   PSAMF ¶ 18; DRPSAMF ¶ 18.   Indeed, between July 7, 2005 and March 5, 2008, Ms. Kirouac was restricted from working forty percent of the time due to her medical conditions by Dr. Campbell.   PSAMF ¶ 18; DRPSAMF ¶ 18.   During periods of medical leave, Ms. Kirouac stated that she became virtually bedridden, experienced severe trouble concentrating, isolated herself from others, cried uncontrollably, occasionally entertained suicidal thoughts, ceased participating in household chores, and slept no more than four or five hours a night.   PSAMF ¶¶ 9-13, 16; DRPSAMF ¶¶ 9-13, 16.   In his February 26, 2008 letter, Dr. Campbell stated that he believed Ms. Kirouac was "emotionally able to return to work"; however, the events following Ms. Kirouac's March 2008 return to work call his recommendation into question.   *See* DSMF ¶ 4; PRDSMF ¶ 4; Part I.B.5-8.   Specifically, Ms. Kirouac's claims of panic attacks upon returning to work, multiple PDIs for failing to follow rules and directions, her emotional interaction with OIC Curtis and Supervisor Blouin on June 13, 2008, and her failure to consistently fulfill her mail carrier duties suggest that she continued to be considerably limited in her ability to concentrate, remember, think, and interact with others upon return to work in 2008.

Although both parties acknowledge that Ms. Kirouac "periodically demonstrated" her ability to successfully perform her mail carrier duties, her periodic ability to concentrate, remember, think, and interact with others does not render her "substantially limited" argument moot.   *See Calero-Cerezo*, 355 F.3d at 22; DSMF ¶ 6; PRDSMF ¶ 6.   Further, Supervisor Blouin's statement that "Ms.

Kirouac's long history of insubordination, immaturity, and emotional issues . . . [and] [h]er instability make[] her a constant safety and security risk" further underscores that Ms. Kirouac's mental impairments substantially limited some of her major life activities.  PSAMF ¶ 73; DRPSAMF ¶ 73.  Thus, viewing the facts in the light most favorable to Ms. Kirouac, considering her history of medical leaves, her experiences while on medical leave, and the events that followed her return to work in 2008, the Court concludes that Ms. Kirouac had a disability under the Rehabilitation Act.

### b.    Job Performance and Qualifications

Under the Rehabilitation Act, a plaintiff is a "qualified individual" if (1) "she possess the requisite skill, experience, education and other job-related requirements for the position" and (2) "she is able to perform the essential functions of the position with or without accommodation."  *Calero-Cerezo*, 355 F.3d at 22.  Both parties appear to agree that Ms. Kirouac was qualified to work as a mail carrier and able to perform the essential functions of her job with or without accommodations. *See Def.'s Mot.* at 8-9; *Pl.'s Opp'n* at 15-16.  Although the parties did not brief this issue extensively, the record shows that Ms. Kirouac worked for the Post Office from sometime before July 7, 2005 until June 24, 2008.  PSAMF ¶¶ 18, 66; DRPSAMF ¶¶ 18, 66.  When she was not on required medical leave from July 7, 2005 to March 5, 2008, Ms. Kirouac's functioning at work improved despite her mental disorders. PSAMF ¶¶ 13, 45; DRPSAMF ¶¶ 13, 45.  In fact, OIC Curtis stated that, when he worked with Ms. Kirouac, she performed her mail carrier duties in a productive

manner.  PSAMF ¶¶ 45-46; DRPSAMF ¶¶ 45-46.  Supervisor Blouin agreed, stating that from mid-March 2008 until late May 2008, Ms. Kirouac's job performance was very good.  PSAMF ¶¶ 45-46; DRPSAMF ¶¶ 45-46.  Dr. Campbell's February 26, 2008 medical release letter also supports a finding that she was qualified to work as a mail carrier.  *See Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 157 (1st Cir. 2009).

Yet, Ms. Kirouac was issued six one-week or two-week suspensions from work; some for failing to follow instructions and for failing to properly perform her duties.  DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶ 23; DRPSAMF ¶ 23.  The Notice of Removal cited Ms. Kirouac's failure to obey her supervisors' instructions and to deliver all the mail on her route prior to leaving time as two of the reasons she was fired from the Post Office.  DSMF ¶ 8; PRDSMF ¶ 8.  Supervisor Blouin's statement, "Ms. Kirouac's long history of insubordination, immaturity and emotional issues" made her believe that Ms. Kirouac "will never be an asset to this office or any other", also calls into question Ms. Kirouac's qualifications for her mail carrier position.  PSAMF ¶ 73; DRPSAMF ¶ 73.  Notably, the *Calero-Cerezo* Court pointed out, "an employee who is unable to control her bizarre and disruptive behavior may be unfit for employment, no matter how advanced her objective skills or how extensive her experience."  355 F.3d at 22.

Despite evidence which suggests that Ms. Kirouac may have been unable to perform the essential functions of her job, such as delivering all of her mail before leaving work, both Ms. Kirouac and the Postmaster insist that she "repeatedly

demonstrated that she was capable of performing her mail carrier duties without any accommodations." *Def.'s Mot.* at 8; *Pl.'s Opp'n* at 16.  In *Calero-Cerezo*, the First Circuit discussed how plaintiffs asserting Rehabilitation Act claims often confront a "Catch-22" because they are required to show that their disabilities substantially limit major life activities and also show that they are able to perform the essential functions of their jobs.  355 F.3d at 22 ("In shorthand, the law requires the individual to be both substantially limited and reasonably functional").  Because the plaintiff in *Calero-Cerezo* presented the Court with substantial evidence that her major depression substantially limited some of her major life activities and both parties agreed that she successfully preformed the essential functions of her job despite her disability, the Court found that there was a genuine issue of material fact regarding her job performance and qualifications.  *Id.* at 22-23.  Viewing the facts in the light most favorable to Ms. Kirouac and following the First Circuit's guidance in *Calero-Cerezo*, the Court concludes that OIC Curtis' and Supervisor Blouin's statements about Ms. Kirouac's productive and satisfactory job performance generate an issue of material fact regarding whether she was "qualified" to work as a mail carrier.  355 F.3d at 22-23.

### c.    Adverse Employment Action

To satisfy the final element of her prima facie case, Ms. Kirouac must show that the Postmaster "took adverse action against her because of [her] disability." *Rios-Jimenez*, 520 F.3d at 41.  "An adverse employment action is one that 'involves [a] discrete change in the terms and conditions of employment, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Madison v. Potter*, No. 07-08-P-S, 2008 U.S. Dist. LEXIS 14386, at *27-28 (D. Me. Feb. 25, 2008) (quoting *De Jesus v. Potter*, 211 F. App'x 5, 9 (1st Cir. 2006)). Here, the adverse employment action was Ms. Kirouac's employment termination at the Post Office. *Pl.'s Opp'n* at 16. In an effort to establish the causal "but for" link between her termination and her disabilities, Ms. Kirouac cites admissions from Post Office management—Supervisor Blouin and OIC Curtis—regarding the motivations for her termination. *Pl.'s Opp'n* at 16-22. Their admissions, she argues, show that she was fired because of her disabilities and because she was perceived as a safety threat to the Post Office and its employees. *Id.* at 16-22. The Postmaster asserts that Ms. Kirouac's argument is misplaced as she cannot prove she was fired "because of" her disabilities and argues that any concerns about her status as a safety threat to the Post Office relate only to the Notice of Emergency Placement, which is irrelevant to the current motion. *Def.'s Mot.* at 9; *Def.'s Reply* at 6.

The Court concludes that the Notice of Emergency Placement is relevant to the current motion as it highlights some of the concerns Post Office management had about Ms. Kirouac's continued employment at the Post Office. Specifically, OIC Curtis stated that he placed Ms. Kirouac on emergency placement because he believed Ms. Kirouac was insubordinate and a safety threat to herself and others at the Post Office and that "[a]fter all the postal shootings and thing[s] that have happened throughout the years, you know, we have to be very extra careful when it

66

comes to anything like this to protect the interest of the post office."  PSAMF ¶ 78; DRPSAMF ¶ 78.  OIC Curtis also noted that on June 13, 2008, Ms. Kirouac seemed emotionally unstable and out of control.  PSAMF ¶ 78; DRPSAMF ¶ 78.  Supervisor Blouin stated that she felt threatened by Ms. Kirouac on June 13, 2008 and that her "long history of insubordination, immaturity and emotional issues ma[de] [her] believe that [Ms. Kirouac] will never be an asset to this office or any other.  Her instability makes her a constant safety and security risk."  PSAMF ¶ 73; DRPSAMF ¶ 73.

As OIC Curtis and Supervisor Blouin made the decision to fire Ms. Kirouac, their statements, which reference both her insubordinate conduct and her "emotional issues", "immaturity", and instability suggest that Ms. Kirouac may ultimately have been fired because of her mental disabilities rather than her insubordinate conduct on June 13, 2008.  PSAMF ¶ 75; DRPSAMF ¶ 75.  *See Lussier v. Runyon*, No. 92-397-P-H, 1994 U.S. Dist. LEXIS 4668, at *33 (D. Me. Mar. 1, 1994) (finding that a Post Office employee with PTSD was fired because of his disability rather than his omission of disorderly conduct convictions on his employment application as his supervisor "made the decision to terminate Lussier because he was afraid that Lussier could be violent" based on an understanding of his PTSD and military background).  The fact that Supervisor Blouin "talked about the confrontations with [Cindy] through the years and stated that 'she was scared of [Ms. Kirouac]'" when discussing whether to fire her implies that Ms. Kirouac's mental disabilities at the very least factored into their decision to fire her.  PSAMF

¶ 79; DRPSAMF ¶ 79.  Further, the Notice of Removal's reference to a letter of warning and two suspensions dating back to February 12, 2007 when viewed together with Ms. Kirouac's history of medical leaves, statements made by Ms. Kirouac's coworkers who believed she was being singled out and targeted for discrimination, and management's increased supervision of Ms. Kirouac upon her return to work in March 2008, would also allow a reasonable juror to conclude that she was ultimately fired because of her mental disabilities.  DSMF ¶ 8; PRDSMF ¶ 8.; PSAMF ¶¶ 31-32, 40, 51-52, 55, 57-58; DRPSAMF ¶¶ 31-32, 40, 51-52, 55, 57-58. Thus, viewing the facts in the light most favorable to Ms. Kirouac, the Court concludes that there is a genuine issue of material fact concerning the "but for" cause of Ms. Kirouac's termination.

### 2.    The Postmaster's Legitimate, Non-discriminatory Reason

Because Ms. Kirouac has successfully established a prima facie case of disability discrimination, the burden shifts to the Postmaster to articulate a legitimate, non-discriminatory reason for the Post Office's employment decision and to support that decision with credible evidence. *Rios-Jimenez*, 520 F.3d at 41.  Here, the Postmaster asserts that Ms. Kirouac was fired for the reasons stated in her June 24, 2008 Notice of Removal, which cited Ms. Kirouac's insubordinate behavior on June 13, 2008, four Post Office rules she violated, and three separate disciplinary incidents on February 12, 2007, June 19, 2007, and June 4, 2008 for failure to properly perform her duties and follow instructions.  *Def.'s Mot.* at 10; DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶ 75; DRPSAMF ¶ 75.  The Notice of Ms.

Kirouac's 14-day suspension on June 4, 2008 describes in detail the reasons for her suspension, which include: failing to follow repeated orders by supervisors to resume working, using the vending machines after clocking in, leaving her case without permission, and failing to perform msp scans.  PSAMF ¶ 55; DRPSAMF ¶ 55.  The record also establishes that Ms. Kirouac was issued four other suspensions, beyond the suspensions mentioned in the Notice of Removal, on June 19, 2007, June 26, 2007, October 9, 2007 as well as a Notice of Proposed Removal on July 24, 2007. PSAMF ¶ 23; DRPSAMF ¶ 23.

Based on Ms. Kirouac's disciplinary record and the Notice of Removal, the arbitrator at the parties' arbitration found that the Post Office had "just cause" to fire Ms. Kirouac.[91]  DSMF ¶ 15; PRDSMF ¶ 15.  In light of Ms. Kirouac's extensive disciplinary history at the Post Office, her actions on June 13, 2008, and the arbitrator's decision, the Court concludes that the Postmaster has satisfied his burden.  *See Calero-Cerezo*, 355 F.3d at 26 (finding that the "history of plaintiff's

---

[91]     The Postmaster points to the fact that Post Office management's decision to fire Ms. Kirouac for the reasons stated in the Notice of Removal was upheld by a neutral arbitrator as additional evidence that the Post Office's decision was legitimate and non-discriminatory.  *Def.'s Mot.* at 10.  As noted in *Dobbins v. Postmaster Gen. & CEO*, the Court should consider Ms. Kirouac's claim de novo and should give the arbitration decision little weight, if any, as the Court must view the facts in the light most favorable to Ms. Kirouac at this stage in the litigation.  No. 05-CV-140-B-W, 2007 U.S. Dist. LEXIS 6675, at *54 n.7 (D. Me. Jan. 29, 2007) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974)).  As the Arbitrator's decision appears to be a standard review of the Post Office's "just cause" determination, the Court considers it probative of the Postmaster's legitimate, non-discriminatory reason to fire Ms. Kirouac; however, it is not persuasive in the Court's pretext analysis.  *See id.* ("[T]he instant motion calls for the Court to decide if a genuine issue of fact exists whether the decision to terminate Dobbins was motivated by discriminatory and/or retaliatory animus.  The arbitrator's decision does not foreclose such a finding"); *Arb. Decision* at 34-38, 42 (concluding that Ms. Kirouac was fired for just cause stating "I share Management's conclusion that the Grievant's conduct after being instructed to complete her route demonstrated a complete disregard for the manager/employee relationship, and her refusal to follow instructions" and "I find that the Grievant engaged in unacceptable conduct . . . and that the discipline imposed was progressive").

insubordinate and disruptive behavior and the occasions when she failed to perform her duties in a satisfactory manner all provided legitimate justification for disciplinary action").

### 3.   Pretext

Finally, as the Postmaster has set forth a legitimate, non-discriminatory reason for Ms. Kirouac's termination, the burden shifts back to Ms. Kirouac "to establish that the [Postmaster's] proffered reason is a pretext intended to conceal discriminatory intent." *Rios-Jimenez*, 520 F.3d at 41. To meet her burden on summary judgment, Ms. Kirouac must produce evidence "'to create a genuine issue of fact with respect to two points: [1] whether the employer's articulated reason for its adverse action was a pretext and [2] whether the real reason was [disability] discrimination.'" *Harding v. Cianbro Corp.*, 436 F. Supp. 2d 153, 180 (D. Me. 2006) (quoting *Quinones v. Buick*, 436 F.3d 284, 290 (1st Cir. 2006)). Pretext may be proven by "showing weaknesses, inconsistencies and contradictions in the employer's proffered legitimate reasons for termination." *Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 180, 197 (D. Me. 2010) (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000)). Also, when "'assessing pretext, the court must look at the total package of proof offered by the plaintiff.'" *Tobin v. Liberty Mutual Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005) (quoting *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 174 (1st Cir. 2003)).

Here, the evidence reveals that there is a genuine issue of material fact regarding the true reason Ms. Kirouac was fired as a mail carrier. To establish

pretext, Ms. Kirouac points the Court to Supervisor Blouin's and OIC Curtis' statements about their reasons for putting her on emergency placement and ultimately firing her.  These statements reference her insubordination but also her potential for "violence", her status as a "constant safety and security risk", and her "immaturity", "emotional issues", "instability", and "mental state of mind."  PSAMF ¶¶ 69-71, 73-74, 78; DRPSAMF ¶¶ 69-71, 73-74, 78.  OIC Curtis also referenced "all the postal shootings and thing[s]" as a factor in his decision to place Ms. Kirouac on off-duty status and Supervisor Blouin mentioned her confrontations with Ms. Kirouac throughout the years when she discussed whether to fire Ms. Kirouac.  PSAMF ¶¶ 78-79; DRPSAMF ¶¶ 78-79.  Both OIC Curtis and Supervisor Blouin were aware of Ms. Kirouac's history of mental disabilities but were unclear whether medical restrictions were placed on her ability to work before the June 13, 2008 incident.  DSMF ¶¶ 7-8; PRDSMF ¶¶ 7-8; PSAMF ¶¶ 42, 44, 59, 61; DRPSAMF ¶¶ 42, 44, 59, 61.  Given their familiarity with Ms. Kirouac's history of mental disorders and the fact that they made the decision to fire Ms. Kirouac, OIC Curtis' and Supervisor Blouin's comments and actions would allow a reasonable juror to conclude that they fired her because of her mental disabilities.  *See Trafton,* 689 F. Supp. 2d at 197 (finding that there was a genuine issue of material fact concerning pretext because of various weaknesses and inconsistences in the defendant's reasons for terminating the plaintiff); *Lussier*, 1994 U.S. Dist. LEXIS 4668, at *33.

The Notice of Removal also listed three "elements" of Ms. Kirouac's past record, which Post Office management factored into her termination decision—a

letter of warning on February 12, 2007 for failure to follow instructions, a 7-day suspension on June 19, 2007 for a failure to follow instructions, and a 14-day suspension on June 4, 2008 for failure to properly perform her duties.  DSMF ¶ 8; PRSMF ¶ 8.  With respect to the discipline on June 4, 2008, Ms. Kirouac explains that she violated the rules and left the workroom without permission because she was having a panic attack.  PSAMF ¶ 55; DRPSAMF ¶ 55.  Also, during the time the two other listed violations occurred—February and June of 2007—Ms. Kirouac was in and out of work on required medical leaves due to her mental disabilities.  DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶ 18; DRPSAMF ¶ 18.   Management's close monitoring of Ms. Kirouac's work performance when viewed together with her record of medical leaves and statements by her coworkers which suggest that Post Office management targeted Ms. Kirouac for harsher enforcement would also allow a reasonable juror to infer that she was fired because of her disabilities.  PSAMF ¶¶ 21-22, 31-32, 50-52, 57-58; DRPSAMF ¶¶ 21-22, 31-32, 50-52, 57-58.   Finally, viewing the facts in Ms. Kirouac's favor, the discrepancies between each parties account of the June 13, 2008 incident—whether Ms. Kirouac threw things around her truck, raised her voice, and acted violently—further supports the Court's decision to let the case go to a jury.  *See* DSMF ¶ 8; PRDSMF ¶ 8.

This is not to say that a jury will find that the Postal Service acted illegally in terminating Ms. Kirouac.  The Postal Service was placed in a difficult position with Ms. Kirouac.  If she failed to do her assigned duties and rankled at supervision, she could claim that her inability to perform her job and her insubordination were

manifestations of her mental disability.   The line between a disobedient and disabled employee is sometimes a close one and a jury could well conclude in this case that the Postal Service terminated Ms. Kirouac not because of her mental impairments but because she was an unmanageable and volatile employee.  As the Postmaster points out, he convinced the neutral arbitrator that the termination was not illegal; he may be able to similarly convince a jury.

Although her record of suspensions and Postmaster St. Andre's March 3, 2008 e-mail confirm that Post Office management, at times, viewed Ms. Kirouac as a problematic and insubordinate employee, other evidence cuts against their non-discriminatory reasoning and would permit a reasonable juror to find that the Post Office actually fired Ms. Kirouac because of her mental disabilities.  *See* DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶¶ 23, 25, 40, 55; DRPSAMF ¶¶ 23, 25, 40, 55.   Thus, viewing the facts in the light most favorable to Ms. Kirouac, the Court concludes that whether the Postmaster's insubordination reasoning was a pretext for disability discrimination is a question best decided by a jury.  *See Harding*, 436 F. Supp. 2d at 181 (acknowledging that a jury could find the defendant's evidence compelling and that the real reason for the plaintiff's discharge "was the cumulative impact of his persistent insubordination" but ultimately denying summary judgment because the evidence could also allow a reasonable juror to find for the plaintiff-employee).

**IV.    CONLUSION**

The Court DENIES the Defendant's Motion for Partial Summary Judgment

(ECF No. 85).

SO ORDERED.


John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 11th day of June, 2013